William FRANZ, et al., Appellants,

v.

UNITED STATES of America, et al.

No. 81–2369.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 20, 1982.

Decided May 10, 1983.

George Kannar, American Civil Liberties Union, New York City, for appellants.

William H. Briggs, Jr., Asst. U.S. Atty., Washington, D.C., for appellees. Stanley S. Harris, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence and Jason D. Kogan, Asst. U.S. Attys., Washington, D.C., were on the brief for appellees.

Before TAMM, EDWARDS and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Separate Statement, concurring in part and dissenting in part, filed by Circuit Judge BORK.

HARRY T. EDWARDS, Circuit Judge:

At issue in this case is the validity of one aspect of the administration of the federal Witness Protection Program.[1] Exercising the discretion vested in them by statute, various federal officials relocated and changed the identities of a government informant, his wife, and her three children by a former marriage, in return for the informant's testimony against alleged leaders of organized crime. Unfortunately, this routine and otherwise unassailable procedure had the effect of severing the ongoing relationship between the children and their natural father. The father brought the present suit—*on behalf of himself and his children*[2]—challenging the actions of the federal officials on a variety of constitutional and statutory grounds. He sought declaratory and injunctive relief to enable him to reestablish contact with his children, and damages to compensate all of them for injuries sustained as a result of their separation. The District Court dismissed the complaint for failure to state a claim upon which relief can be granted.[3]

As all parties concede, resolution of this case requires a weighing of three important interests: the public interest in the suppression of organized crime; the interest of the informant, his spouse, and the children in securing protection against the threat of violent reprisal to which they are all exposed; and the interest of the children and their father in *maintaining the bonds* between them. The essence of the plaintiffs' claims is that, in acting *to sever totally and permanently* the relationships between a non-custodial parent and his minor children without their participation or consent, the defendants struck an impermissible balance of the foregoing interests. Although we reach no judgment on the proper

---

1. The statutory authority for the program is found in 18 U.S.C. *prec.* § 3481 (1976).

2. The latter portion of the suit was predicated on Fed.R.Civ.P. 17(c), which authorizes children to sue by their "next friend[s]."

3. *Franz v. United States*, 526 F.Supp. 126, 129 (D.D.C.1981). The District Court noted, in addition, that "[t]he plaintiff's [sic] cause of ac-

tion presents serious procedural problems both as to venue and jurisdiction." *Id.* at 127. However, because the court's decision was founded on its conclusion that the plaintiffs failed to state a claim, we will confine our attention, for the purposes of this appeal, to that judgment. The defendants will have an opportunity on remand to raise any appropriate jurisdictional defenses.

ultimate disposition of this case, we conclude that the plaintiffs·clearly have stated a cause of action sufficient to survive a motion to dismiss.

 Taking as true the facts alleged in the complaint,[4] we find that the administrators of the Witness Protection Program abrogated the constitutionally protected rights of the plaintiffs to one another's companionship without (1) affording the father requisite procedural protections, (2) making a particularized finding and showing of a legitimate state interest sufficient to justify the infringement, or (3) availing themselves of equally effective alternative solutions to the problem before them that would have been less restrictive of the plaintiffs' rights. Accordingly, we reverse and remand for further proceedings.[5]

4. We are, of course, bound to make such an assumption for the purpose of reviewing the District Court's judgment that the plaintiffs failed to state a claim. *Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 172, 87 S.Ct. 1526, 1529, 18 L.Ed.2d 704 (1967). We express no view regarding the veracity of the plaintiffs' allegations.

5. As to the only other claim asserted below that the plaintiffs press on appeal, we conclude that dismissal was proper. The plaintiffs insist that the Attorney General lacks the express statutory authority he would need to "federalize" the aspect of domestic-relations law implicated in this case. *See Ridgway v. Ridgway,* 454 U.S. 46, 54–55, 102 S.Ct. 49, 54–55, 70 L.Ed.2d 39 (1981). Assuming, *arguendo,* that the Attorney General needed such authority to effect the kind of incidental, *de facto* displacement of state law at issue here, he possessed it. *See* note 7 *infra* and accompanying text.

6. Pub.L. No. 91–452, §§ 501–504, 84 Stat. 922, 933–34. For the current codification of the provision, see note 1 *supra.* The full text of the statute reads:

SEC. 501. The Attorney General of the United States is authorized to provide for the security of Government witnesses, potential Government witnesses, and the families of Government witnesses and potential witnesses in legal proceedings against any person alleged to have participated in an organized criminal activity.

SEC. 502. The Attorney General of the United States is authorized to rent, purchase, modify, or remodel protected housing facilities and to otherwise offer to provide for the

## I. BACKGROUND

### A.

The Witness Protection Program was established as part of the Organized Crime Control Act of 1970.[6] Its purposes are to guarantee the safety of government witnesses who agree to testify against alleged participants in organized criminal activity and thereby to create an incentive for persons involved in such activities to become informants. Broad discretion is vested in the Attorney General "to provide for the security of" such witnesses.[7]

It was originally contemplated that the program would be implemented principally through the purchase and maintenance of housing facilities that would serve as more or less permanent havens for witnesses and

health, safety, and welfare of witnesses and persons intended to be called as Government witnesses, and the families of witnesses and persons intended to be called as Government witnesses in legal proceedings instituted against any person alleged to have participated in an organized criminal activity whenever, in his judgment, testimony from, or a willingness to testify by, such a witness would place his life or person, or the life or person of a member of his family or household, in jeopardy. Any person availing himself of an offer by the Attorney General to use such facilities may continue to use such facilities for as long as the Attorney General determines the jeopardy to his life or person continues.

SEC. 503. As used in this title, "Government" means the United States, any State, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof. The offer of facilities to witnesses may be conditioned by the Attorney General upon reimbursement in whole or in part to the United States by any State or any political subdivision, or any department, agency, or instrumentality thereof of the cost of maintaining and protecting such witnesses.

SEC. 504. There is hereby authorized to be appropriated from time to time such funds as are necessary to carry out the provisions of this title.

7. *See* § 501, set forth in note 6 *supra.*

their families.[8] That approach soon proved impracticable and the strategy was adopted of relocating witnesses and their families and providing them with "new identities, the documents to support these new identities, as well as housing, employment, medical services and other social services."[9]

The Attorney General has delegated to the United States Marshals Service virtually all of his authority over the actual administration of the program.[10] But decisions regarding who will be accepted into the program are still made by certain direct subordinates of the Attorney General. An Order promulgated by the Justice Department in 1975 provides that a recommendation to admit a prospective witness must be made by a U.S. Attorney or Assistant U.S. Attorney and approved by the Assistant Attorney General in charge of the concerned division.[11] Only after this screening process has been completed is the Marshals Service notified and instructed to prepare for the induction of the witness.[12]

The Justice Department Order also prescribes criteria by which prospective inductees are to be evaluated. The Assistant Attorney General is instructed to admit a "proposed witness" into the program only upon satisfaction of the following conditions:

(1) The person is a qualifying witness in a specific case in process or during or after a grand jury proceeding,

(2) Evidence in possession indicates that the life of the witness and/or that of a member of the witness' family or household is in immediate jeopardy, and

(3) Evidence in possession indicates it would be advantageous to the Federal interest for the Department to protect the witness and/or a family or household member.[13]

These criteria, it will be observed, make no mention of the impact of the admission of a witness and his "family or household" on established relationships between members of that household and other persons (*e.g.,* natural parents); the Assistant Attorney General is to consider only the advantage to the "Federal interest" of accepting each candidate, not the effects upon the interests of third parties.[14]

8. *Witness Security Program: Hearings Before the Permanent Subcomm. on Investigations of the Senate Comm. on Governmental Affairs,* 96th Cong., 2d Sess. 242 (1980) (statement of Howard Safir, Assistant Director for Operations, U.S. Marshals Service, Acting Chief, Witness Security Section) [hereinafter cited as 1980 *Hearings*].

9. *Id.*

10. *See* 28 C.F.R. § 0.111(c) (1982) (instructing the Director of the Marshals Service to make "[p]rovision for the health, safety, and welfare of Government witnesses and their families pursuant to sections 501–504 of Pub.L. 91–452"). Essentially the same regulation was in effect at the time the informant and his family were admitted into the program. *See* 28 C.F.R. § 0.111(c) (1977) (revised as of July 1, 1977). *See also* Affidavit of Howard Safir, ¶ 2, Appendix ("App.") 62.

11. Justice Department Order OBD 2110.2, Jan. 10, 1975, at 1–3, *reprinted in Witness Protection Program: Hearings Before the Subcomm. on Administrative Practice and Procedure of the Senate Judiciary Comm.,* 95th Cong., 2d Sess. 134–36 [appendix 2] (1978) [hereinafter cited as 1978 *Hearings*].

12. *Id.* at 136. Although, as indicated, the Marshals Service does not participate in the decision whether a prospective witness qualifies for admission, individual "inspectors" in the Service do appear to make recommendations regarding "whether or not the subject will be a workable case"—*i.e.,* "whether or not [the Service] can handle it." 1980 *Hearings* at 244 (testimony of Howard Safir). These recommendations are forwarded to the "Office of Enforcement Operations" at the Justice Department, which decides whether to "approve" the witness for the program. *Id.*

13. Order OBD 2110.2, *supra* note 11, at 1–2, *reprinted in* 1978 *Hearings* at 134–35.

14. The Justice Department Order does direct U.S. Attorneys "in the field," when making a recommendation to the Assistant Attorney General of the concerned division that a particular candidate should be admitted, to specify, *inter alia,* the "[n]umber of family and/or household members to be authorized funding (name, age, relationship)." Order OBD 2110.2, *supra* note 11, at 3, *reprinted in* 1978 *Hearings* at 136. But the language of the directive strongly suggests that the only relevance of the information is to assist the authorizing agent in

Nor does it appear that peripheral familial rights are taken into account at any other point in the standard admission procedure or in the subsequent administration of a case. The one apparent (and partial) exception to this generalization turns out, in practice, to be illusory. At the time of their induction, all witnesses and adult members of their households are required to read and sign a lengthy "Memorandum of Understanding." [15] The document includes the following provisions: a warning by the Marshals Service that it "WILL NOT SHIELD witnesses from civil or criminal litigation initiated prior to or subsequent to entry into the Program"; [16] a mandate that "[a]ll court orders which are directed to the witness must be immediately brought to the attention of the ... Marshals Service" (combined with a strong suggestion that the Service will assist in their enforcement); [17] and a form authorizing either the Marshals Service or a named party to receive service of process on behalf of the witness. [18] These provisions might be interpreted as requirements that participants in the program abide by judicially ratified familial rights of third parties. Indeed, a former Director of the Marshals Service testified in 1978 that it was the current "policy" of the Service to "work to secure some accommodations so the rights of [a non-relocated parent] are protected"—specifically, to "make [the children] available [for visitation] if the circumstances are proper." [19] However, such a "policy" certainly was not implemented in this case. [20] And the defendants did not suggest, either in their brief or at oral argument, that the Service makes any affirmative effort to afford non-custodial parents access to their relocated children. [21] We are compelled to conclude, therefore, that the character and strength of familial relationships between members of a witness' household and third parties who will not be relocated are given no formal consideration either by the Justice Department officials responsible for deciding whether to admit a candidate and his "family or household" into the Witness Protection Program or by the administrators of the Marshals Service when deciding how any given case should be handled.

### B.

Partly because of the preliminary stage at which the suit was dismissed, the circumstances out of which this action grows are not entirely clear. The following is a rough outline of the pertinent facts, assuming all allegations in the plaintiffs' complaint are true.

In 1966, William Franz married Catherine Mary Franz. In the ensuing years, the couple had three children: William Michael Franz, Christine Catherine Franz, and Donna Marie Franz. Sometime thereafter the

estimating the probable cost of admitting and supporting the witness and his household.

**15.** The Memorandum itself is reprinted as Exhibit 29 of the 1978 *Hearings* at 230–51. The procedure whereby it is presented and explained to prospective entrants is described in 1980 *Hearings* at 243–44 (testimony of Howard Safir).

**16.** Memorandum of Understanding at 3, *reprinted in* 1978 *Hearings* at 233 (emphasis in original).

**17.** Memorandum of Understanding at 7, *reprinted in* 1978 *Hearings* at 237. The provision specifically mentions "[c]ourt orders which grant custody of minor children to persons other than a witness who is being relocated" and insists that such orders "will be honored and said minor children *WILL NOT* be relocated in violation of the ... order." *Id.* (emphasis in original). It contains no comparable reference, however, to decrees awarding visitation or other non-custodial familial rights to a person who is not being relocated.

**18.** Memorandum of Understanding at 15, *reprinted in* 1978 *Hearings* at 245.

**19.** 1978 *Hearings* at 123 (testimony of William E. Hall).

**20.** *See* text at notes 25–27 *infra*.

**21.** Further evidence that the "policy" of the Marshals Service differs markedly from Hall's representations is provided by the burgeoning number of suits involving claims similar to those presented here. *See, e.g., Ruffalo v. Civiletti,* 539 F.Supp. 949 (W.D.Mo.1982), *aff'd,* 702 F.2d 710 (8th Cir.1983); *Grossman v. United States,* 80 Civ. 5589 (S.D.N.Y. dismissed without prejudice March 23, 1982).

couple separated. In February 1974, a Pennsylvania court awarded William visitation rights; Catherine appears to have had or been awarded custody of the children.[22] Between 1974 and 1978, William regularly exercised his right to visit his offspring.[23] On July 9, 1976, William and Catherine were divorced.

Sometime prior to the divorce, Catherine "developed a personal relationship" with (and later may have married) one Charles Allen.[24] Allen subsequently confessed himself to be a contract killer in the employ of leaders of organized crime in the Philadelphia area. He offered to testify in a federal criminal trial in return for the relocation and protection of himself, Catherine, and Catherine's three children. The Assistant Attorney General of the Criminal Division of the Department of Justice approved the arrangement, and in February 1978, Allen and the members of his household were accepted into the Witness Protection Program.[25] We assume that Allen and Catherine read and signed a copy of the Memorandum of Understanding described above.[26] On February 12, the Marshals Service transported Allen, Catherine, and the children from Sewell, New Jersey to an undisclosed location and provided them with new identities.

Since that date, William has been attempting, in a variety of ways, to determine the whereabouts of or to establish contact with his three children. He has repeatedly requested information from the Marshals Service. He has written his former wife (care of the Marshals Service) pleading his case. And, most recently, he has initiated litigation.[27]

22. Since the decision below, a dispute has arisen between the parties as to whether William was, in fact, awarded visitation rights by the state court. *Compare* Appellees' Brief at 5 n. 7 *with* Appellants' Reply Brief at 4 n. 1. It appears that no record of a visitation order can be found. The issue is further complicated by the possibility, raised by the plaintiffs, that William's legal rights would be even more extensive in the absence of a formal order allocating custody and visitation privileges than they would be under such an order.

We refrain from exploring this narrow but complex question for two reasons. First, the District Court assumed that William had been granted visitation rights, *see Franz v. United States,* 526 F.Supp. at 127, and we confine ourselves for the purposes of this appeal to the facts on which the court relied. Second, our disposition of the case does not turn upon nuances of the legal entitlements secured by William. *See* text at notes 74–87 *infra.*

23. Complaint at 4, *reprinted in* App. 8.

24. The character of the liaison between Catherine and Allen is not entirely clear. The plaintiffs allege their marriage only "upon information and belief." *Id.* However, we do not consider the formal status of their relationship particularly important.

25. The plaintiffs have consistently maintained that Allen and his family were admitted into the program in February 1978. *See, e.g.,* Complaint at 5, *reprinted in* App. 9. For the purpose of this appeal, we assume that date is accurate. The affidavit of Howard Safir, Assistant Director of Operations, United States Marshals Service, however, indicates that, according to his records, Allen was admitted in February 1979. App. 62–63. If this suit ever threatens to terminate in an award of damages, it will of course be necessary to determine the correct date of admission.

26. The plaintiffs' complaint does not specifically allege that Allen and Catherine read and signed the Memorandum. However, the following combination of circumstances prompts us to assume that they did so: (i) The Acting Chief of the Witness Security Section of the Marshals Service insisted in congressional hearings that all inductees are shown and agree to abide by the Memorandum, *see* note 15 *supra* and accompanying text; (ii) the plaintiffs in their brief to this court cited some of the provisions of the Memorandum, apparently assuming agreement thereto by Allen and Catherine, *see* Appellants' Brief at 7–8, and the defendants did not contest the plaintiffs' reliance on the document; (iii) the plaintiffs' lack of first-hand knowledge that Allen and Catherine agreed to the terms of the Memorandum is readily explainable by the fact that the policy of the Marshals Service is to retain the signed documents and keep them confidential. *See* Memorandum of Understanding at 21, *reprinted in* 1978 *Hearings* at 251. On remand, the defendants will have an opportunity, if they wish, to challenge our assumption.

27. Named as defendants in the suit are: the United States; the Department of Justice; the Marshals Service; former Attorney General Benjamin Civiletti; Attorney General William French Smith; Marshals Service Director William E. Hall; unknown agents of the Marshals Service; and Charles Allen. The government

The administrators of the program have not been wholly unresponsive. They have, by their own account at least, delivered William's letters to Catherine. But they appear not to have put any pressure on either Allen or Catherine to reveal to William the location of the children or otherwise to accommodate William's desires. And they have not attempted to devise any system for reconciling the conflicting interests of the affected parties. Officials of the Marshals Service acknowledge that they are capable of arranging meetings between William and his children without endangering Allen, Catherine, or the children,[28] but they refuse to establish such contacts without her consent.

## II. STATE ACTION

Before turning to the assessment of the plaintiffs' various claims of constitutional violation, we must resolve a threshold question. The defendants argue that, however unfortunate the plaintiffs' injuries, they are not legally responsible for those harms. The defendants point out that it is Catherine who has decided to deny William access to his children. The defendants also insist that they have done nothing more than decline to compel her to behave otherwise. For two reasons, they contend, such inac-

tion cannot expose them to liability under the Constitution. First, they claim they lack the authority to do otherwise; they have no power, in other words, to force Catherine to accede to visitation of the children by William. Second, they argue that, even if they had such authority, their refusal to exercise it would not be a sufficiently affirmative or efficacious act to make them responsible for the consequences of Catherine's behavior.

■ The defendants' first argument gives us little pause. Whatever may be the legal or equitable limits on the defendants' coercive authority, arising out of the terms of the Memorandum of Understanding or other agreements entered into by the Marshals Service and Allen and Catherine,[29] the defendants clearly had the authority, at the time they consented to the admission of Allen and his household, to insist that the inductees agree to accommodate in some way the rights of William and the rights of the children to see their natural father. The Memorandum of Understanding contains several structurally similar provisions. The admittees undertook, for example, to stay away from the "danger area" unless they had the permission and protection of the Service [30] and to permit the Service (or a designated substitute) to accept service of

---

officials are all sued individually and in their official capacities.

**28.** The defendants make this acknowledgement explicit in their brief to this court, Brief at 16, and their counsel confirmed that position at oral argument. The defendants' position is consistent with previous representations made by officials of the Marshals Service. See 1978 Hearings at 122–23 (testimony of William Hall and Arthur Daniels, Chief, Witness Security Division).

**29.** It should be noted, the Memorandum of Understanding expressly provides that,

since it is within the Attorney General's discretion to approve participation in the Program, the witness may be terminated from the Program when the Attorney General determines that the life or person of the witness is no longer in danger, or for other reasons

deemed appropriate by the Attorney General or his representative.
Memorandum at 2, reprinted in 1978 Hearings at 232 (emphasis added). Although these provisions lend support to certain of the plaintiffs' claims, we are not insensitive to the defendants' arguments that their insistence at this late date that Catherine respect William's visitation rights might breach some implied promises made to the inductees that they would be guaranteed absolute anonymity indefinitely if they abided by the terms explicitly set forth in the Memorandum, and that such a breach might adversely affect the credibility of the Service in the future. From the plaintiffs' perspective, however, there remains a question whether the defendants may ever enter into such an agreement where a direct effect thereof is to totally and permanently abrogate all relationships between a non-custodial parent and his children.

**30.** Memorandum of Understanding at 3, re-

process on their behalf.[31] The sanction for violation of these and other clauses is "termination" from the program. Those provisions are undoubtedly valid and enforceable; the discretion vested in the Attorney General by statute [32] is broad enough to enable him or his representative to insist upon obedience to such terms as a condition of admission into and continuation in the program. In short, the defendants plainly cannot absolve themselves of responsibility on the ground that they have no authority to do what the plaintiffs demand.

■ The defendants' second contention, albeit also without merit, warrants a somewhat more extended response. To evaluate it, we must venture into a sometimes obscure area of constitutional law: the doctrine relating to the degree to which a private party's behavior must be instigated by or dependent upon the exercise of governmental authority to justify attribution of the consequences of that behavior to "state action." [33] Decisions involving this issue tend to turn upon nuances in the peculiar "facts and circumstances" of the case at hand [34] and, thus, often are unusually difficult. Fortunately, the present suit does not present especially troublesome questions. Viewed from any of a number of perspectives, the conduct of the defendant officials is seen to be sufficient to establish a constitutionally significant link between the government and the alleged infringement of the plaintiffs' rights.[35]

It is clear that the defendants, by accepting Catherine and the children into the program along with Allen, are largely responsible for the success of Catherine's effort to deny William access to his offspring. Without the aid of the administrators of the program in providing her with a new identity, Catherine almost certainly would not have been able to frustrate William's attempts to exercise and enforce his visitation

*printed in* 1978 *Hearings* at 233.

**31.** Memorandum of Understanding at 15, *reprinted in* 1978 *Hearings* at 245 (discussed in the text at note 18 *supra*).

**32.** *See* §§ 501, 502, *reprinted in* note 6 *supra*.

**33.** The phrase "state action" is used here in its generic sense, to refer to action by any level of government, from local to national. *See, e.g.,* L. TRIBE, AMERICAN CONSTITUTIONAL LAW 1147 n. 2 (1978). At issue in the present case is action by officials of the federal government, but doctrine developed in the context of suits involving conduct by state and municipal bodies and officials is directly relevant.

**34.** *See Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 722, 725–26, 81 S.Ct. 856, 860, 861–62, 6 L.Ed.2d 45 (1961).

**35.** The fact that the suit is brought against the defendant officials and not against Catherine arguably might affect our analysis. It has been suggested that the content of the test for determining whether there has been "state action" in situations like the present ought to vary depending on whether relief is sought against the government or the private actor. *See* Brown, *State Action Analysis of Tax Expenditures,* 11 HARV. C.R.–C.L. L. REV. 97, 116–19 (1976) (advocating a lower "required level of significance" when the remedy sought is termination of the government's involvement in the activity). And a few cases seem to suggest that some kind of distinction along these lines is appropriate. *See Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982) (stressing the importance of finding a "nexus" between the state and the challenged action in a situation in which the plaintiff seeks to hold the state liable for the behavior of a private party); L. Tribe, *supra* note 33, at 1148 n. 7 (suggesting some such differences might be extracted from the case law). The advocates of a two-level doctrine related to the status of the defendant are not without opponents, however. *See* McCoy, *Current State Action Theories, the* Jackson *Nexus Requirement, and Employee Discharges by Semi-Public and State-Aided Institutions,* 31 VAND.L.REV. 785, 802 (1978). And, for the most part, decisions by the Supreme Court do not seem to turn upon whether a government or a private party would be affected by successful prosecution of the suit in question. *Compare, e.g., Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350–58, 95 S.Ct. 449, 453–57, 42 L.Ed.2d 477 (1974), *with, e.g., Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 172–79, 92 S.Ct. 1965, 1971–74, 32 L.Ed.2d 627 (1972) (elaborating essentially identical "state action" theories despite the fact that the former sought to require a privately-owned utility to continue service while the latter sought to require a government agency to revoke the liquor license of a private club). In short, we do not think that the fact that the defendants in the instant suit are governmental officials requires that the case be accorded either specially stringent or specially lenient treatment.

rights; with that aid, she has been able to act with impunity. Such a potent contribution to the ability of one private party to infringe the legal interests of another by itself might be sufficient to give rise to "state action." [36]

■ But there is more: this is not a case in which the government has merely provided general financial or other aid to a private party, without which he would have been unable to act as he did; rather, there is a close "nexus" between the content of the government's aid and the specific behavior that is challenged in the suit.[37] The nexus is formed principally by the defendants' encouragement and support of Catherine's decision to hide the children from William.[38] To some extent, such encouragement is embodied in the terms of the Memorandum of Understanding by which Allen and his household were informed of the nature of the program. Thus, signatories are obliged to "acknowledge[ ] the necessity to terminate correspondence, where possible, with persons known prior to entry into the Witness Security Program for reasons of security"[39] and generally not to act in any way that might "jeopardize[ ] the witness' security";[40] such undertakings may well have made Catherine more reluctant than she otherwise would have been to keep open the channels of communication with her former husband.[41] But more importantly, encouragement of the challenged behavior inevitably has been generated by the structure of the program. The defendants have placed Catherine in a position where any effort by her to accommodate William's and the children's reciprocal rights—at least

**36.** *Cf. Norwood v. Harrison,* 413 U.S. 455, 466, 93 S.Ct. 2804, 2811, 37 L.Ed.2d 723 (1973) (Granting financial aid to a private party under circumstances in which "that aid has a significant tendency to facilitate, reinforce, and support private discrimination" constitutes impermissible state action.); *Smith v. Allwright,* 321 U.S. 649, 664–65, 64 S.Ct. 757, 765–66, 88 L.Ed. 987 (1944) (When a State "cast[s] its electoral process in a form which permits a private organization to practice racial discrimination in the election," it "makes the action of the [private organization] the action of the State.") (alternative rationale).

**37.** In recent years, the Supreme Court has emphasized the importance of the existence of a "nexus" of this sort, particularly when the subjection of a private actor to regulation or guidance by the state is the alleged source of "state action." *See Jackson v. Metropolitan Edison Co.,* 419 U.S. at 351, 95 S.Ct. at 453 ("[T]he inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may fairly be treated as that of the State itself."); *Blum v. Yaretsky,* 102 S.Ct. at 2786 (quoting the foregoing language from *Jackson* ).

**38.** The encouragement of Catherine's choice may well be the most important factor in this case. If state action reliably may be found upon the identification of any one factor, that factor is significant governmental promotion of the specific conduct by the private actor that allegedly has abrogated the plaintiff's rights. *See Blum v. Yaretsky,* 102 S.Ct. at 2786 ("[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."); *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 2771, 73 L.Ed.2d 418 (1982) (quoting the foregoing language from *Blum* ); *Jackson v. Metropolitan Edison Co.,* 419 U.S. at 357 n. 17, 95 S.Ct. at 457 n. 17 (emphasizing the fact that "there is no suggestion in this record that the [government agency] intended either overtly or covertly to encourage the [private actor's] practice"); *Moose Lodge No. 107 v. Irvis,* 407 U.S. at 176–77, 92 S.Ct. at 1973 (refusing to find state action where governmental regulation "cannot be said to in any way foster or encourage racial discrimination"); *Reitman v. Mulkey,* 387 U.S. 369, 381, 87 S.Ct. 1627, 1634, 18 L.Ed.2d 830 (1967) (an ostensibly neutral state constitutional amendment that, in practice, "will significantly encourage and involve the State in private discriminations" held to be state action).

**39.** Memorandum of Understanding at 8, *reprinted in* 1978 *Hearings* at 238.

**40.** Memorandum of Understanding at 3, *reprinted in* 1978 *Hearings* at 233.

**41.** It might be responded that other provisions in the Memorandum seem to urge or even require compliance with outstanding court orders. *See* notes 16–18 *supra* and accompanying text. But a closer reading suggests that those terms are concerned principally with the settlement of outstanding claims, not with the preservation of adjudicated familial rights, and they appear consistently to have been so interpreted by the Marshals Service. *See* text at notes 20–21 *supra.*

in the absence of active assistance by the Marshals Service in ensuring the secrecy and security of contacts—may well endanger the lives of her spouse, her children and herself.[42] It is hard to imagine a more powerful kind of impetus.

There is yet a third theory upon which a finding of "state action" may be based. This case involves a situation in which the plaintiffs' claims are founded in significant part upon state law governing family relationships. In particular, William asserts certain rights under Pennsylvania law to maintain contact and visitation with his minor children. See note 22 supra. Catherine clearly had no power or authority under applicable state law to enter into an arrangement with another private party to modify or vitiate the rights of William and her children to maintain their relationship. Thus, when Catherine entered the Witness Protection Program, pursuant to an agreement with the defendants, she accomplished something that was not otherwise legally achievable absent the formal intervention of the federal government. Thus viewed, this is a classic case of "government action," where a "federal statute is the source of the power and authority by which ... private rights are lost or sacrificed.... The enactment of the federal statute authorizing [the federal Witness Protection Program] ... is the governmental action on which the Constitution operates ...." Abood v. Detroit Board of Education, 431 U.S. 209, 218 n. 12, 97 S.Ct. 1782, 1791 n. 12, 52 L.Ed.2d 261 (1977) (quoting Railway Employes' Department v. Hanson, 351 U.S. 225, 232, 76 S.Ct. 714, 718, 100 L.Ed. 1112 (1956)).

Expanding our field of vision somewhat, we observe that the defendant officials and Allen and his household also are involved in a symbiotic relationship. Not only are they joint participants in a program from which they all benefit, but the advantages reaped by each group are dependent upon the activities of the other. Thus Allen, Catherine, and the children obtain protection from retaliation by organized crime, and Catherine gains the ability, in practice, to keep the children for herself. The defendants (on behalf of the government in general) not only gain the testimony provided by Allen, but also benefit from the incentive, created by their demonstrated ability to shield Allen and his household, for other potential witnesses to come forward with evidence against organized crime. To some extent, moreover, that incentive is arguably strengthened by Catherine's decision to deny William access to the children; the greater the government's ability to portray the Witness Protection Program as one in which participants are free to start a completely new life, unfettered by any prior commitments, the more effective will be their effort to recruit other informants in the future.

Interdependence of the kind just described between the government and a private actor has been held to warrant attribution to the government of the conduct of the private party.[43] This "joint-venture" doctrine derives partly from the principle that, having not only countenanced but benefited from behavior alleged to have infringed private interests, the state must accept responsibility for the injury.[44] And partly it is founded on a recognition of the probable symbolic impact of such mutually beneficial activities; the state ought not to be permitted to disclaim responsibility for the consequences of conduct with which, in the eyes of the public, it appears to be intertwined. Both of these considerations are clearly applicable to the instant case.

---

42. The inducement of such sentiments cannot be dismissed on the ground that they are unfortunate by-products of a program generally designed to foster the safety of all concerned. That argument goes to the question whether the particular application of the program at issue here can survive constitutional scrutiny, not to the question whether there has been sufficient "state action" to subject it to constitutional examination.

43. See Moose Lodge No. 107 v. Irvis, 407 U.S. at 175, 177, 92 S.Ct. at 1972, 1973 (dicta); Burton v. Wilmington Parking Auth., 365 U.S. at 724–25, 81 S.Ct. at 861.

44. See Burton v. Wilmington Parking Auth., 365 U.S. at 724, 81 S.Ct. at 861.

■ Finally, we note that, in this case, the symbolic impact of the mutually beneficial activities is accentuated by the overt participation by government officials in the actions that resulted in the concealment of the children.[45] Officers of the Marshals Service obviously were heavily involved in the initial relocation of Allen and his household and they have assisted in various ways in keeping their whereabouts secret. Through such participation, the defendants at least seem to have lent their imprimatur to all efforts by Allen or Catherine to cut themselves off from people who figured in their past lives. Such apparent ratification and support add to our willingness to sub-

ject the defendants' conduct to constitutional scrutiny.

In short, many analytical roads lead to the same conclusion: the defendants are constitutionally accountable for the alleged injury to the plaintiffs.[46] We now turn to that accounting.

## III. CONSTITUTIONALLY PROTECTED INTERESTS

■ It is beyond dispute that "freedom of personal choice in matters of family life is a fundamental liberty interest" protected by the Constitution. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982).[47] That freedom encom-

---

45. In deciding "state action" questions, the Supreme Court has frequently attended to the presence or absence of overt participation by state officials (executive or judicial) in the activities that eventuated in the asserted injury. *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936–42, 102 S.Ct. 2744, 2754–57, 73 L.Ed.2d 482 (1982); *Rendell-Baker v. Kohn,* 102 S.Ct. at 2770 n. 6; *Flagg Bros. v. Brooks,* 436 U.S. 149, 160 n. 10, 98 S.Ct. 1729, 1735 n. 10, 56 L.Ed.2d 185 (1978); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 155–56, 90 S.Ct. 1598, 1605, 1607, 26 L.Ed.2d 142 (1970); *Shelley v. Kraemer,* 334 U.S. 1, 19, 68 S.Ct. 836, 845, 92 L.Ed. 1161 (1948). The Court has never made clear why such involvement, particularly when it is only ministerial in nature, should be important—why it makes a difference, for example, whether attachment of property pursuant to a state statute is effected with or without the nondiscretionary assistance of a clerk of court and county sheriff, *compare Lugar v. Edmondson Oil Co.,* 102 S.Ct. at 2754–57, *with Flagg Bros. v. Brooks,* 436 U.S. at 160 n. 10, 98 S.Ct. at 1735 n. 10. As suggested in the text, we think the explanation is to be sought in the symbolic effect of such participation. The Constitution was designed to embody and celebrate values and to inculcate popular acceptance of them, as much as to compel governments to abide by them. *See* THE FEDERALIST No. 49, at 349 (J. Madison) (B. Wright ed. 1961); J. Madison, Speech before the House of Representatives (defending his draft of the Bill of Rights) (June 8, 1789), *reprinted in* THE MIND OF THE FOUNDER 221 (M. Meyers ed. 1973); Letter from James Madison to Thomas Jefferson (Oct. 17, 1788), *reprinted in id.* at 207. Over the course of our history, the Constitution has continued to fill those various roles, *see* Lerner, *Constitution and Court as Symbols,* 46 YALE L.J. 1290 (1937)—arguably, (at least recently) to our considerable benefit. It is thus appropriate, even essential, that, when expounding the Constitution, we be alert to situations in which

a government, by sanctioning activities by a private party that it is forbidden to do directly, undermines the "constitutive" function of the document. Ministerial involvement of governmental officials is relevant to a "state action" inquiry, in other words, because it increases the likelihood that government will be perceived as approving of the private actor's behavior and the values that underlie it.

46. Our conclusion is consistent with that recently reached by the Eighth Circuit in *Ruffalo v. Civiletti,* 702 F.2d 710 at 716–17 (8th Cir.1983).

We limit ourselves to the finding that there has been "state action" in some form in this case—*i.e.,* that the defendants, collectively, may not absolve themselves of responsibility merely by asserting that they are doing nothing more than respecting the uncoerced wishes of Catherine. We express no opinion on the question of *which* of the defendants are responsible for what aspects of the injuries to the plaintiffs. See note 12 *supra* and accompanying text for a portion of the complex and as yet unclear factual foundation of the latter issue.

47. *See also Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978) (dicta); *Smith v. Organization of Foster Families,* 431 U.S. 816, 842, 97 S.Ct. 2094, 2108, 53 L.Ed.2d 14 (1977) (dicta); *Moore v. City of East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) (plurality opinion); *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974); *Stanley v. Illinois,* 405 U.S. 645, 651–52, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) (dicta); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923).

passes a wide variety of choices and activities: the decision to marry;[48] procreation;[49] the use of contraception;[50] the decision not to carry a child to term;[51] and cohabitation with members of one's extended family.[52] Among the most important of the liberties accorded this special treatment is the freedom of a parent and child to maintain, cultivate, and mold their ongoing relationship.[53]

The constitutional interest in the development of parental and filial bonds free from government interference has many avatars. It emerges in a parent's right to control the manner in which his child is reared and educated[54] and in the child's corresponding right not to have the content of his instruction prescribed by the state.[55] It contributes heavily to a parent's right to direct the religious upbringing of his child.[56] And, above all, it is manifested in the reciprocal rights of parent and child to one another's "companionship."[57]

When asserted by a parent and child in a traditional nuclear family, the foregoing rights are acknowledged to be potent. It might be argued, however, that they are less formidable when asserted by a noncustodial parent—one who retains and regularly exercises "visitation rights" but who participates little in the day-to-day care and nurturing of his children.

To assess that argument we turn first to the case law. That inquiry unfortunately proves inconclusive; while the bulk of the pertinent precedent seems to suggest that we should not differentiate between custodial and noncustodial contexts when deciding what protections are constitutionally due a parent-child relationship, each of the germane cases has dealt with a factual situation or legal issue significantly different from the problem before us.

Dicta favorable to the plaintiffs may be found in *Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). Justice Marshall, speaking for a unanimous Court, seemed to imply that "a [once] married father who is separated or divorced from the mother and is no longer living with his child" could not constitutionally be treated differently from a currently married father living with his child. *Id.* at 255–56, 98 S.Ct.

The question of what the constitutional "protection" of this freedom entails is taken up in Part IV, *infra.*

**48.** *See Zablocki v. Redhail,* 434 U.S. 374, 383, 386, 98 S.Ct. 673, 679, 681, 54 L.Ed.2d 618 (1978).

**49.** *See Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942).

**50.** *See Carey v. Population Servs. Int'l,* 431 U.S. 678, 685, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977).

**51.** *See Roe v. Wade,* 410 U.S. 113, 153–54, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147 (1973).

**52.** *See Moore v. City of East Cleveland,* 431 U.S. at 500–06, 97 S.Ct. at 1936–39 (plurality opinion).

It has been suggested that these various "familial rights" are too disparate to be fairly lumped together and that, indeed, to conflate them is dangerously to obscure differences in their status and strength. We express no opinion on the merits of the charge; in particular, we do not mean to imply that our discussion of the protections that must be accorded the re-

ciprocal interests of parent and child in one another's companionship, *see* Part IV, *infra,* is equally applicable to other "familial rights."

**53.** *See Quilloin v. Walcott,* 434 U.S. at 255, 98 S.Ct. at 554 (dicta); *Wisconsin v. Yoder,* 406 U.S. 205, 232–33, 92 S.Ct. 1526, 1541–42, 32 L.Ed.2d 15 (1972); *Stanley v. Illinois,* 405 U.S. at 651, 92 S.Ct. at 1212; *Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir.1977).

**54.** *See Parham v. J.R.,* 442 U.S. 584, 602–04, 99 S.Ct. 2493, 2504–05, 61 L.Ed.2d 101 (1979); *Ginsberg v. New York,* 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968); *Prince v. Massachusetts,* 321 U.S. at 165–66, 64 S.Ct. at 442 (dicta); *Pierce v. Society of Sisters,* 268 U.S. at 534–35, 45 S.Ct. at 573–74; *Meyer v. Nebraska,* 262 U.S. at 401, 43 S.Ct. at 627.

**55.** *See Prince v. Massachusetts,* 321 U.S. at 166, 64 S.Ct. at 442 (dicta).

**56.** *See Wisconsin v. Yoder,* 406 U.S. at 233, 92 S.Ct. at 1542.

**57.** *See Stanley v. Illinois,* 405 U.S. at 651, 92 S.Ct. at 1212; *Duchesne v. Sugarman,* 566 F.2d at 825.

at 54–55.[58] That suggestion is reinforced by some language in two of the Court's decisions dealing with the procedural adequacy of state laws making possible the termination of interests of non-custodial parents. In *Armstrong v. Manzo,* 380 U.S. 545, 550, 85 S.Ct. 1187, 1190, 14 L.Ed.2d 62 (1965), the Court took for granted that the interest of a divorced father in the preservation of his visitation rights is a "liberty interest" sufficient to trigger the application of procedural due process doctrine. And in *Santosky v. Kramer,* 455 U.S. at 749, 753–54, 102 S.Ct. at 1392, 1394, decided last term, the Court expressly held that the interest of a parent, who has temporarily lost custody of his child, in avoiding elimination of his "rights ever to visit, communicate with, or regain custody of the child" is important enough to entitle him to the procedural protections mandated by the Due Process Clause. The relevance of these two decisions to the instant case is limited by the fact that the establishment of a "liberty interest" sufficient to warrant application of procedural due process doctrine does not necessarily mean that that interest will be deemed "fundamental" and thereby entitled to the full panoply of substantive constitutional protections. Nevertheless, the Court's willingness, in each case, to assimilate the interests at stake to the rights enjoyed by custodial parents[59] affords some support for the proposition that, for constitutional purposes, all (exercised) parental rights should be treated as equivalent.[60]

Some language inconsistent with that proposition may be found in the two decisions rendered by the Second Circuit in the only appellate case comparable to the one before us. In *Leonhard v. Mitchell,* 473 F.2d 709 (2d Cir.), *cert. denied,* 412 U.S. 949, 93 S.Ct. 3011, 37 L.Ed.2d 1002 (1973), a father in a position similar to that occupied by William sought a writ of mandamus compelling the Marshals Service to reveal to him the whereabouts of his children. The court ruled that, in view of a state's "substantial range of authority to protect the welfare of children . . . [which] extends to the determination of parental custody and visitation rights," there is no "*clear* constitutional right to custody or visitation rights." *Id.* at 713 (emphasis added). In *Leonhard v. United States,* 633 F.2d 599 (2d Cir.1980), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981), a subsequent damage action growing out of the same controversy, the court concluded "that the federal officials' removal and concealment of the children on the consent of their mother and sole custodian, did not violate the children's constitutional rights . . . ." *Id.* at 620.

58. The holding in the case was that the Equal Protection Clause did *not* bar differential treatment of a married father and a father who "has never exercised actual or legal custody over his child, and thus has never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child." *Id.*

59. *See Santosky v. Kramer,* 455 U.S. at 753, 102 S.Ct. at 1394 ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life."). *See also Lassiter v. Department of Social Servs.,* 452 U.S. 18, 27, 101 S.Ct. 2153, 2160, 68 L.Ed.2d 640 (1981) (dicta) (describing "a parent's desire for and right to 'the companionship, care, custody, and management of his or her children' " (in a context very similar to that in *Santosky*) as "an impor-

tant interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection' ") (quoting *Stanley v. Illinois,* 405 U.S. at 651, 92 S.Ct. at 1212, a case involving the rights of an illegitimate father who had lived with and supported his children all their lives, *id.* at 650 n. 4, 92 S.Ct. at 1212 n. 4).

60. *See also Wise v. Bravo,* 666 F.2d 1328, 1338 (10th Cir.1981) (Seymour, J., concurring in the result) (dicta); *Ruffalo v. Civiletti,* 539 F.Supp. 949, 952 (W.D.Mo.1982) (holding, in a case very similar to that before us, that "visitation rights are entitled to due process protection [substantive as well as procedural], at least when the challenged governmental interference is of a serious, continuing nature"), *aff'd on other grounds,* 702 F.2d 710 at 714–15 (8th Cir.1983) (proceeding on the assumption that the plaintiff parent had a legal right to custody of the children, and consequently declining to "decide whether a parent's visitation rights are constitutionally protected").

However, the differences between the *Leonhard* cases and the suit before us are sufficiently marked that the foregoing comments bear only lightly on the question with which we are grappling. Most importantly, in *Leonhard* there was no suggestion that the Marshals Service was capable of arranging secret meetings between the father and the children without endangering anyone's life; the court of appeals thus assumed that the defendants' only option, if they wished to protect the children, was to deny the father access to them. In the first case, the court's inquiry was further circumscribed by the nature of the remedy sought; presented with a stark choice between granting or denying an order that would reveal the location of the children, the court not surprisingly was reluctant to accord much weight to the plaintiffs' constitutional claims. In the second suit, the court's attention was deflected from the main issue by a different set of circumstances: the father's constitutional claims were, by then, time-barred and the children had been returned to him. The only remaining relevant question was whether the children were entitled to damages for the violation of their rights during the period in which they had been denied the company of their father. The court concluded that the defendants, when deciding whether to reveal the location of the children, were entitled to rely on the (putatively reliable) judgment of the mother concerning what was necessary to ensure their safety. In

this action, by contrast, a safe way of affording the father access to the children does exist, the question whether the defendants should make use of it is properly before us, and the mother's awareness of the option undermines any presumption that she is acting solely in the best interests of her offspring. In short, the reflections of the Second Circuit are sufficiently intertwined with the idiosyncracies of the cases before it as to be of little moment in the present context.

To summarize, the balance of germane precedent inclines in favor of according similar constitutional status to custodial and non-custodial parent-child relations, but none of the cases is controlling. Consequently, to assess fairly the strength of the interests asserted by the plaintiffs in this case we must explore the concerns that underlie the constitutional protection traditionally accorded parental and filial bonds.

Three considerations account for the skepticism with which, when determining the constitutional validity of governmental action, we regard any interference with parent-child relations. The first is the important place such relations have long held in our culture. In the United States, parents historically have participated heavily in the rearing of their children.[61] More importantly, persons in this country traditionally have believed that parents have a *right* to maintain contact with and shape the development of their children.[62]

---

**61.** The Supreme Court made this point most vigorously in *Wisconsin v. Yoder,* 406 U.S. at 232, 92 S.Ct. at 1541:

The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.

The argument is somewhat overstated. In the early years of the settlement of this country, for example, many parents (particularly in the northern colonies) adhered to the practice common among English Puritans of "putting out" children—placing them at an early age in other homes where they were treated partly as foster children and partly as apprentices or farmhands. One of the motivations underlying the maintenance of this custom seems to have been

the parents' desire to avoid the formation of strong emotional bonds with their offspring—bonds that might temper the strictness of the children's discipline or interfere with their own piety. *See* E. MORGAN, THE PURITAN FAMILY 32–38 (1956); Demos, *Notes on Life in Plymouth Colony*, WILLIAM & MARY Q., 3d Ser., XXII 264 (1965), *reprinted in* COLONIAL AMERICA: ESSAYS IN POLITICS AND SOCIAL DEVELOPMENT 57, 75–78 (S. Katz ed. 1976); A. MACFARLANE, THE FAMILY LIFE OF RALPH JOSSELIN 205–10 (1970). By the eighteenth century, however, the practice seems to have died out and the "tradition" of which the Court speaks had been established.

**62.** *See Bellotti v. Baird,* 443 U.S. 622, 638, 99 S.Ct. 3035, 3045, 61 L.Ed.2d 797 (1979) (plurality opinion) (justifying some legal restrictions on minors' freedom of choice, partly on the basis of the need to preserve and reinforce the

The second factor consists of recognition that shielding relations between parents and children serves two complementary social functions. On one hand, it facilitates socialization of the children. We rely on parents to instill in their offspring the values and motivations necessary to develop them into "mature, socially responsible citizens."[63] We assume that this is a function the state cannot effectively perform; only parents (or some close substitute) are sufficiently sensitive to the myriad, constantly fluctuating needs and drives of children to be able to provide them the combination of support and guidance necessary to prepare them for later life.[64] Such preparation, in turn, is essential not only to enable each child to think and act independently when he comes of age,[65] but to preserve and promote our system of government[66] and our way of life.[67] On the other hand, vesting in parents primary responsibility for the upbringing of children ensures the preservation of diversity and pluralism in our culture. As the Supreme Court explained long ago:

> The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.

*Pierce v. Society of Sisters,* 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925).[68] The undesirability of cultural homogenization would lead us to oppose efforts by the state to assume a greater role in children's development, even if we were confident that the state were capable of doing so effectively and intelligently.[69] In short, our collective wish to preserve and promote the enlivening variety of our social and political life prompts us to be wary of any tampering with our highly decentralized, substantially unregulated, parent-dominated child-rearing system.[70]

parental role in their upbringing, recognition of which is "deeply rooted in our Nation's history and tradition"); *Meyer v. Nebraska,* 262 U.S. at 402, 43 S.Ct. at 628. The technique of defining constitutionally protected interests through reference to traditional values has been adopted by the Court in dealing with many other "familial" rights. *See, e.g., Zablocki v. Redhail,* 434 U.S. at 383–86, 98 S.Ct. at 679–81; *Moore v. City of East Cleveland,* 431 U.S. at 503–05, 97 S.Ct. at 1937–38 (plurality opinion). For descriptions and defenses of this general mode of constitutional interpretation, see *Poe v. Ullman,* 367 U.S. 497, 542, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting); *Developments in the Law—The Constitution and the Family,* 93 HARV.L.REV. 1156, 1177–87 (1980). For a criticism of it, see J. ELY, DEMOCRACY AND DISTRUST 60–63 (1980).

**63.** *Bellotti v. Baird,* 443 U.S. at 638, 99 S.Ct. at 3045 (plurality opinion). *See also Wisconsin v. Yoder,* 406 U.S. at 233, 92 S.Ct. at 1542; *cf. Moore v. City of East Cleveland,* 431 U.S. at 503–04, 97 S.Ct. at 1937–38 (plurality opinion) (arguing that we rely on the family—nuclear or extended—to "inculcate and pass down many of our most cherished values, moral and cultural"); S. KATZ, WHEN PARENTS FAIL 1–2, 12–13 (1971).

**64.** *Prince v. Massachusetts,* 321 U.S. at 166, 64 S.Ct. at 442 (dicta); C. LASCH, HAVEN IN A HEART-

LESS WORLD 3–4 (1977). Wilkinson & White, *Constitutional Protection for Personal Lifestyles,* 62 CORNELL L.REV. 563, 623–24 (1977).

**65.** *See* J. LOCKE, TWO TREATISES OF GOVERNMENT: THE SECOND TREATISE ch. VI, at 321–36 (P. Laslett ed. 1960).

**66.** *See* Heymann & Barzelay, *The Forest and the Trees: Roe v. Wade and Its Critics,* 53 B.U.L. REV. 765, 772–73 (1973).

**67.** *See Smith v. Organization of Foster Families,* 431 U.S. at 844, 97 S.Ct. at 2109 (dicta).

**68.** *Cf. Moore v. City of East Cleveland,* 431 U.S. at 506, 97 S.Ct. at 1939 (plurality opinion) ("[T]he Constitution prevents East Cleveland from standardizing its children—and its adults—by forcing all to live in certain narrowly defined family patterns.").

**69.** *See Bellotti v. Baird,* 443 U.S. at 638, 99 S.Ct. at 3045 (plurality opinion).

**70.** *See* B. RUSSELL, MARRIAGE AND MORALS 217–18 (2d ed. 1957); Areen, *Intervention Between Parent and Child: A Reappraisal of the State's Role in Child Neglect and Abuse Cases,* 63 GEO. L.J. 887, 893 (1975); Hirschoff, *Parents and the Public School Curriculum: Is There a Right to Have One's Child Excused from Objectionable*

■ The third consideration is our appreciation of the profound importance of the bond between a parent and a child to the emotional life of both.[71] Frequently each party to the relationship depends heavily on his ties with the other for his sense of self-worth, for his very self-definition. To rephrase the point in the language of entitlements, a parent's right to the preservation of his relationship with his child derives from the fact that the parent's achievement of a rich and rewarding life is likely to depend significantly on his ability to participate in the rearing of his offspring.[72] A child's corresponding right to protection from interference in the relationship derives from the psychic importance to him of being raised by a loving, responsive, reliable adult.[73]

■ To determine the strength of the constitutional interests asserted in the instant case, we must access the relevance of the foregoing considerations to the plaintiffs' relationship as it existed prior to the defendants' alleged interference with it. We begin by asking what features distinguish the relationship between William and his offspring from the paradigmatic parent-child bond in a nuclear family. The answer turns upon a subtle distinction. It is well established that the strength and scope of constitutionally protected familial rights are not determined by the contours of state (or federal) law; what is important is the nature of the bond in question, not the way in which it has been categorized by a legislature or court. See Smith v. Organization of Foster Families, 431 U.S. 816, 845, 97 S.Ct. 2094, 2110, 53 L.Ed.2d 14 (1977) (dicta); Stanley v. Illinois, 405 U.S. 645, 651–52, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551

Instruction?, 50 S.Cal.L.Rev. 871, 905–09 (1977); Moskowitz, Parental Rights and State Education, 50 Wash.L.Rev. 623, 635–36 (1975); Wald, State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards, 27 Stan.L.Rev. 985, 992 (1975); The Constitution and the Family, supra note 62, at 1186 n. 171, 1215 & n. 111, 1354 & n. 23.

**71.** See Smith v. Organization of Foster Families, 431 U.S. at 844, 97 S.Ct. at 2109 (dicta) (stressing the importance of the "emotional attachments" arising out of the "familial relationship"); Stanley v. Illinois, 405 U.S. at 652, 92 S.Ct. at 1213 (recognizing the importance of the warmth of a familial bond); B. Russell, supra note 70, at 183–88, 194–95, 202–03. Cf. Moore v. City of East Cleveland, 431 U.S. at 505, 97 S.Ct. at 1938 (plurality opinion); id. at 508, 97 S.Ct. at 1940 (Brennan, J., concurring) (both opinions emphasizing the strength of the emotional ties between members of an extended family).

**72.** See Garvey, Child, Parent, State, and the Due Process Clause: An Essay on the Supreme Court's Recent Work, 51 S.Cal.L.Rev. 769, 806–07 (1978); Hafen, Children's Liberation and the New Egalitarianism: Some Reservations About Abandoning Youth to Their "Rights," 1976 B.Y. U.L.Rev. 605, 626–29; The Constitution and the Family, supra note 62, at 1353.

We intend our observations about the importance of contact with his children to a parent's emotional equilibrium to be comments, not about human nature, but about life in the United States today. Identification of constitutional rights, unmentioned in the document itself, that are nevertheless deserving of "fundamental" status is possible only through contextual analysis; in other words, we must take as given the general features of our society and polity and seek to identify the freedoms and relationships that, in the present environment, are crucial to self-definition and fulfillment. Cf. Duncan v. Louisiana, 391 U.S. 145, 149 & n. 14, 88 S.Ct. 1444, 1447 & n. 14, 20 L.Ed.2d 491 (1968) (When determining whether the Fourteenth Amendment obliges states to abide by one of the restrictions on criminal procedure embodied in the Bill of Rights, the pertinent question is not whether the limitation at issue is "necessarily fundamental to fairness in every criminal system that might be imagined but [whether it] is fundamental in the context of the criminal processes maintained by the American States."). Thus, for present purposes, we pay no heed to the argument that our political and economic order induces us to place undue weight on intra-familial relations and that, in a better organized society, public life would absorb some (even most) of the energy presently invested in children and the home. See, e.g., J. Rousseau, The Social Contract bk. III, ch. 15, at 93 (G.D.H. Cole trans. 1950); M. Walzer, Radical Principles 39–40 (1980).

**73.** See Duchesne v. Sugarman, 566 F.2d at 825; J. Goldstein, A. Freud & A. Solnit, Beyond the Best Interests of the Child 9–64 (1973); Garvey, supra note 72, at 815–17; Goldstein, Medical Care for the Child at Risk: On State Supervision of Parental Autonomy, 86 Yale L.J. 645, 649–50 (1977); The Constitution and the Family, supra note 62, at 1353–54.

(1972).[74] It is equally well established, on the other hand, that the state possesses substantial—and virtually exclusive—regulatory authority in the field of domestic relations. *See Sosna v. Iowa,* 419 U.S. 393, 404, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975). Thus, there is no question that the Pennsylvania court in the instant case had authority to vest in Catherine custody over the children and to award William no more (and no less) than visitation rights.[75] What this means is that, for the purpose of weighing the plaintiffs' constitutional interests, we should eschew inferences drawn from the manner in which the state *describes* their rights or deals with them in other contexts,[76] but we must consider carefully the manner in which state law defines and limits William's access to and responsibility for the children.

A nuanced analysis of the sort just indicated would require detailed knowledge of domestic relations law in Pennsylvania—specifically of the practical concomitants of the terms "custody" and "visitation rights." We lack such knowledge and the parties have made little effort to educate us. For reasons that will become apparent, however, we believe that our inquiry may proceed upon two crude assumptions:[77] (1) The non-custodial parent in a legally reorganized family generally spends considerably less time with his children than the custodial parent. (2) The custodial parent

legally has the principal, if not exclusive, authority to make decisions regarding the child's education, religious training, and discipline[78] and, in practice, is usually the dominant force in the child's upbringing, but the non-custodial parent (assuming he exercises his visitation rights) in most instances retains some influence over the child's intellectual and moral development. On the basis of these rough generalizations, how should the reciprocal constitutional interests of a non-custodial parent and his children in one another's companionship be measured?

The first of the three factors discussed above—the existence of a tradition of respect for the institution in question—provides us little guidance. It seems undeniable that recognition of the sanctity of the bond between a child and his non-custodial parent is far less firmly embedded in our cultural heritage than respect for the autonomy of the relations between a child and parent in a nuclear family. But that discrepancy is readily explainable on the basis of the relative rarity, in United States society in the past, of regularly exercised "visitation rights." That situation is rapidly changing, however; the hegemony of the nuclear family is steadily being undermined. It has been predicted that the proportion of marriages fated to end in divorce will soon reach forty percent.[79] In light of

74. *See also The Constitution and the Family, supra* note 62, at 1277–78, for a sound argument as to why "liberty interests" of this sort should not be defined by positive law. The difference between the treatment of familial rights and other liberty interests that have been held to be more dependent upon positive law, *see, e.g., Meachum v. Fano,* 427 U.S. 215, 226–28, 96 S.Ct. 2532, 2539–40, 49 L.Ed.2d 451 (1976) (convicted prisoner's interest in avoiding adverse changes in his conditions of confinement); *Paul v. Davis,* 424 U.S. 693, 710–12, 96 S.Ct. 1155, 1164–65, 47 L.Ed.2d 405 (1976) (reputation), may be explained by the "fundamental" (and arguably pre-social) character of the former.

75. As indicated above, we are assuming for the purpose of this appeal that the state court indeed did so. *See* note 22 *supra.*

76. Thus, for example, the fact that the state permitted the termination of "visitation rights"

upon a lesser showing of neglect or unfitness than it required for the termination of "custody" would be irrelevant to our inquiry.

77. If, on remand, these assumptions are shown to be inaccurate, the District Court may be compelled to reconsider some of our conclusions.

78. *See In re Wesley J.K.,* 299 Pa.Super. 504, 445 A.2d 1243, 1248 (Pa.Super.Ct.1982) ("Legal custody" is defined by Pennsylvania statute as "[t]he legal right to make major decisions affecting the best interests of a minor child, including but not limited to, medical, religious and educational decisions.").

79. U.S. Bureau of the Census, Dep't of Commerce, Current Population Reports, Special Studies, Series P–23, No. 84, Divorce, Child Custody, and Child Support 1 (1979). In 1978 there were 2.2 million marriages and 1.1 million divorces. *Id.*

the fact that a divorced parent who is not granted custody is routinely awarded visitation rights,[80] the result will be a large and growing number of children whose time and affection are divided between a custodial and a non-custodial parent.[81] In short, the institution of the "broken" family is becoming ever more socially important. To rely on the absence of a strong tradition of respect for one of the constituent relationships of that institution in determining its constitutional status seems senseless. Recognition of the need to adjust the meaning of the Constitution to conform to changes in social life [82] requires, in this instance, that we eschew reliance on history.

Reference to the second of the three factors is more productive of insight. Neither of the two complementary social functions fulfilled by traditional parent-child relations would appear to be specially dependent upon non-interference with the bond between a child and his non-custodial parent. Socialization of the children in such situations presumably can be adequately performed by the custodial parent (with or without the aid of a new spouse). And the values transmitted by a custodial parent are likely to be as distinctive as those transmitted by a non-custodial parent; vesting exclusive responsibility in the former for the child's upbringing, consequently, would not affect the overall diversity of the society. These points should not be overstated. To the extent that a child remains emotionally dependent upon a non-custodial parent, cutting off his access to that parent will be painful and disorienting and will in some measure reduce his ability to absorb any system of values.[83] But, on balance, it would appear that, insofar as our willingness to use the Constitution to shield parental and filial bonds from state interference derives from our recognition of the social needs served by those relations, we would be warranted in according diminished protection to the relation between a child and his non-custodial parent.

The force of the third consideration in the present context is somewhat harder to assess. The emotional importance of the bond between some parents and their children diminishes following the disintegration of the original family unit and the parent's loss of custody.[84] For others, however, the relationship remains important—even intensifies in response to the disruption or termination of other attachments.[85] Moreover, there is considerable evidence that the emotional stability of children of divorced parents is often tied to the quality of their continuing relationships with their non-custodial parent.[86] On this point, in short, it appears impossible to say with any confidence that the concerns that underlie our willingness to accord "fundamental" status to parent-child bonds are any less telling when the relationship in question consists of mere "visitation."

Our analysis thus far appears inconclusive. One of the two relevant factors suggests that the plaintiffs are entitled to only diminished constitutional protection; the other would place them on a par with parents and children in traditional settings. To choose between those options, we must examine more closely both the particularities of the case before us and the practical implications of attempting to differentiate it from a nuclear family.

---

80. *See* 2 W. NELSON, DIVORCE AND ANNULMENT 275 (1961).

81. *See* BUREAU OF THE CENSUS, *supra* note 79, at 3, 11; Glick, *Children of Divorced Parents in Demographic Perspective,* J.Soc.Issues, Fall 1979, at 170, 171–72.

82. *See, e.g., Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976).

83. *See* note 86 *infra* and accompanying text.

84. *See* J. WALLERSTEIN & J. KELLY, SURVIVING THE BREAKUP 122–46, 235–57 (1980); R. WEISS, MARITAL SEPARATION 187–98 (1975).

85. *See* J. WALLERSTEIN & J. KELLY, *supra* note 84, at 122–46, 235–39, 257–63; R. WEISS, *supra* note 84, at 187–98.

86. *See* J. WALLERSTEIN & J. KELLY, *supra* note 84, at 218–19; Hess & Camara, *Post-Divorce Family Relationships as Mediating Factors in the Consequences of Divorce for Children,* J.Soc.Issues, Fall 1979, at 79, 92–94.

We observe, to begin with, that *the alleged "infringement" in this case is no mere disruption or curtailment of the parent-child relation but its permanent termination.* Under these circumstances, the "emotional-attachments" consideration seems especially relevant and *equally* relevant to situations involving custodial and non-custodial parents. Arguably, state regulation of, for example, a child's education or religious upbringing threatens only moderately the emotional ties between the child and his parents—and is less likely significantly to affect the relations between the child and a non-custodial parent than the relations between the child and a custodial parent. Severance of the filial bond, on the other hand, obviously cuts deeply into the emotional interests of both parent and child—and may well be as painful and disorienting to a non-custodial parent as to one with whom the child enjoyed more frequent contact.

The foregoing generalization will not always hold. But to determine the severity of the emotional damage likely to be caused by any *particular* severance would be extremely difficult. The strength and psychic significance of a specific familial relation would be very hard to assess. Certainly no one objective index (such as frequency of visitation or degree of financial support) would be reliable. Moreover, the thorough inquiry necessary to make even a competent judgment of this sort would be time-consuming, degrading to the parties, and itself highly disruptive of the relationship in question.[87]

█ In light of these considerations, we conclude that the constitutional interests asserted by the plaintiffs are, in critical respects, roughly comparable to the interests of a parent and child in a viable nuclear family. We stress, however, that our analysis extends only to the question of the constitutional status of the right of a non-custodial parent and his or her children not to be totally and permanently prevented from ever seeing one another. In other words, we are considering here a narrow factual situation in which the government has acted to sever completely all ties between a non-custodial parent and his children without their participation or consent. In addressing this specific situation, we do not mean to suggest that a parent (or child) has a "fundamental right" to maintain visitation privileges in any particular way.

It is undisputed that the plaintiffs' protected interests have been invaded. We have established that the defendants are constitutionally responsible for that invasion. *See* Part II. *supra.* We now turn to the question whether, on the facts as alleged in the complaint, the defendants can justify their actions and the effects thereof.

## IV. GOVERNMENTAL ENDS AND MEANS

█ Rights of the sort asserted by the plaintiffs are not absolute; when incompatible with sufficiently potent public interests, they must give way. But such situations arise infrequently. Severance of the relationship between a parent and his child will survive constitutional scrutiny only if four requirements are met: (a) the asserted governmental interest must be compelling; (b) there must be a particularized showing that the state interest in question would be promoted by terminating the relationship; (c) it must be impossible to achieve the goal in question through any means less restrictive of the rights of parent and child; and (d) the affected parties must be accorded the procedural protections mandated by the Due Process Clauses.

These requirements, and the degree to which the defendants in the instant case have complied with each, are considered in order below. Our conclusion is that the plaintiffs have stated a cause of action in at least three of the four dimensions. We

---

87. Our reluctance to mandate such an inquiry into the dynamics of a particular parent-child relationship is analogous to the distaste with which we contemplate the prospect of an inevitably disruptive inquiry into the workings of a religious institution. *See, e.g., Roemer v.* *Board of Pub. Works,* 426 U.S. 736, 748–51, 761–65, 96 S.Ct. 2337, 2345–47, 2351–53, 49 L.Ed.2d 179 (1976) (plurality opinion) (dicta); *Lemon v. Kurtzman,* 403 U.S. 602, 619–22, 91 S.Ct. 2105, 2114–15, 29 L.Ed.2d 745 (1971).

offer a relatively detailed analysis to explain our conclusion in the hope of preventing similar debacles in the future. Cases such as this can be avoided only through the promulgation of executive or congressional guidelines governing the administration of the Witness Protection Program that ensure the identification and accommodation of interests like those of the plaintiffs. The formulation of such guidelines may be difficult; the following discussion is intended to facilitate their development.

## A.

▮▮▮▮ The first and most important implication of our finding that the plain-

tiffs' stake in one another's companionship must be deemed a "fundamental liberty interest" is that the government must have a very good reason for abrogating their rights. Whatever may be the strength of the state interest necessary to justify a minor or moderate interference with their relationship,[88] it is clear that *permanent termination* of their bond can be justified only by the promotion of a "compelling" objective.[89]

The defendants might point to two objectives in an effort to provide a compelling justification for their conduct in this case:[90] promotion of the "best interests" of the

**88.** Individual Supreme Court Justices have openly advocated a "sliding-scale" approach when analyzing infringements of fundamental interests like those asserted here; the greater the impairment, the more substantial the state interest promoted by the action must be to justify it. *See Zablocki v. Redhail,* 434 U.S. 374, 396, 98 S.Ct. 673, 686, 54 L.Ed.2d 618 (1978) (Stewart, J., concurring in the judgment); *Williams v. Illinois,* 399 U.S. 235, 260, 262–63, 90 S.Ct. 2018, 2031, 2032–33, 26 L.Ed.2d 586 (1970) (Harlan, J., concurring in the result); *Shapiro v. Thompson,* 394 U.S. 618, 663, 89 S.Ct. 1322, 1346, 22 L.Ed.2d 600 (1969) (Harlan, J., dissenting). Some such doctrine might be inferred from the case law. *See* P. BREST, PROCESSES OF CONSTITUTIONAL DECISIONMAKING 988–90 (1975). In the present context, we need not decide whether or how to adopt the approach.

**89.** For the general principle that abrogation of a fundamental right can be justified only by a "compelling state interest," see, *e.g., Carey v. Population Servs. Int'l,* 431 U.S. 678, 686, 97. S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977); *Roe v. Wade,* 410 U.S. 113, 155, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973). For application of that principle to termination of parent-child relationships, see *Alsager v. District Court,* 545 F.2d 1137, 1137 (8th Cir.1976) (per curiam) (adopting the relevant portions of the district court's decision, 406 F.Supp. 10, 21–22 (S.D. Iowa 1975)); *Roe v. Conn,* 417 F.Supp. 769, 777 (M.D.Ala.1976); *The Constitution and the Family, supra* note 62, at 1235–38.

The same result might be reached by a more circuitous route: the "fundamental rights" branch of equal protection doctrine. We observe that the Witness Protection Program, as implemented, results in the denial of access by a particular group (namely, the non-relocated parents of children taken into the program and the children themselves) to a fundamental right (the right to the companionship of one's child

or parent). Accordingly, the Program should be subjected to "strict scrutiny" under the Equal Protection Clause. In other words, the government must show that discrimination between members of the affected group and other parents and children is necessary to promote a "compelling governmental interest." *See Dunn v. Blumstein,* 405 U.S. 330, 334–43, 92 S.Ct. 995, 999–1003, 31 L.Ed.2d 274 (1972); *Kramer v. Union Free School Dist. No. 15,* 395 U.S. 621, 626–28, 89 S.Ct. 1886, 1889–90, 23 L.Ed.2d 583 (1969). If there is any difference in practice between this approach and the simpler one described in the text, it is that equal protection analysis is more rigid, less sensitive to variations in the degree to which access to or exercise of the right at stake has been impaired. *See The Constitution and the Family, supra* note 62, at 1193–97. *But see* Note, *Equal Protection and Due Process: Contrasting Methods of Review Under Fourteenth Amendment Doctrine,* 14 HARV.C.R.—C.L.L.REV. 529, 561–65 (1979) (suggesting that the two approaches, as applied, are functionally indistinguishable). Thus, though equal protection theory has, on occasion, been invoked in dealing with familial rights, *see Zablocki v. Redhail,* 434 U.S. at 383–91, 98 S.Ct. at 679–83, and might be adapted to fit the instant case, we see no need to rely upon it. *Cf. Zablocki v. Redhail,* 434 U.S. at 395–96, 98 S.Ct. at 685–86 (Stewart, J., concurring in the judgment); *Williams v. Illinois,* 399 U.S. at 259–60 (Harlan, J., concurring in the result) (both arguing that "substantive due process" analysis, despite its negative connotations, is more honest and discriminating).

**90.** In point of fact, the defendants fail to offer any justification, relying for their defense to the plaintiffs' constitutional claims solely on the theory that they are not responsible for the severance of the relationship between William and the children. Appellees' Brief at 14–17. Having rejected the one argument advanced by

children themselves or advancement of the public interest in the suppression of organized crime.

■■■ The first argument merits only brief attention. For two reasons, invasion of the plaintiffs' protected interests cannot be justified on the basis of the government's *parens patriae* interest in protecting the welfare of the children.[91] First, the Supreme Court has made plain, albeit in dictum, that a government could not break up a "natural family" solely on the basis of a determination that the children's "best interest" would be served thereby, absent a showing that the parents were "unfit" to care for their offspring. *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978) (quoting *Smith v. Organization of Foster Families,* 431 U.S. 816, 862–63, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring in the judgment)). The relations between William and his offspring are entitled to no less protection. *See* Part III, *supra.* Second, the only plausible basis for a justification related to the "best interests" of the children would be the possibility that their lives would be endangered if William were allowed to see them.[92] That argument, however, is seriously weakened by the fact that the government itself must bear at least some responsibility for creating any such danger. By inducing Allen to come forward with evidence against leaders of organized crime, it has created a situation in which the children are potential targets of retaliation. Invasion of the plaintiffs' rights should not be legitimated by the need to solve a problem the defendants themselves have generated.

The second argument available to the defendants is much more substantial. Organized crime, they might point out, is a serious problem in the United States today. Moreover, its very "organization," and the code of secrecy by which its participants are bound, hamper the efforts of law enforcement agencies to obtain the evidence necessary to stop or curtail it. Evidence against organization leaders is particularly hard to come by. The police therefore must rely heavily on testimony provided by informants—people formerly or currently involved in organized criminal activity. Securing the aid of such persons is not easy; they are aware that by providing evidence against their former partners or employers, they place their own lives and the lives of their families in jeopardy. If the government were unable to guarantee their safety, they would rarely come forward. In sum, suppression of organized crime requires that the government be empowered, in its discretion, to relocate informants and members of their households and to maintain the secrecy of their new identities. And that, in turn, requires that the government be free, when it deems appropriate, to terminate contacts between witnesses or members of their families and people who figured in their past lives.

The foregoing justification clearly has some force. Whether it would be sufficient to warrant severance of the bond between a child and his natural parent we find it impossible, at this point, to say. Our inability to resolve this issue derives partly from the paltriness of the pertinent precedent. The lack of guidance afforded us by the case law results, in turn, principally from the frequency with which we and other courts have employed a convenient device for evading questions like that before us. Faced with a conflict between an important individual right and a powerful state inter-

---

the defendants, *see* Part II. *supra,* we might reverse the judgment of the District Court without further ado. Our desire to help chart this hitherto little explored legal territory, however, prompts us to proceed.

**91.** For a good discussion of this source of state authority to intervene in familial relations, see *The Constitution and the Family, supra* note 62, at 1221–42.

**92.** For the purpose of pursuing this portion of the analysis, we assume that such a danger would inevitably be associated with accommodation of William's rights. The significance of the availability of a procedure by which the government could achieve its objectives and still afford William some access to the children without placing them at risk is taken up in Part IV.C. *infra.*

est that allegedly warrants infringement of the right, courts have been prone to hypothesize that the state's objective would prevail if the challenged statute directly and effectively promoted it, and then go on to examine the closeness of the "fit" between the statute and the asserted objective—in general and in the case at bar. The usual conclusion is that the enactment, in fact, would do little to advance the asserted end. Its principal justification thus undercut, the enactment collapses when subjected to constitutional attack. *See, e.g., Carey v. Population Services International,* 431 U.S. 678, 690–91, 694–96, 97 S.Ct. 2010, 2018–19, 2021–22, 52 L.Ed.2d 675 (1977); *Moore v. City of East Cleveland,* 431 U.S. 494, 500, 97 S.Ct. 1932, 1936, 52 L.Ed.2d 531 (1977) (plurality opinion).[93]

In the following sections, we follow a similar analytical path.[94] But, though that analysis suffices to decide the case before us, it leaves unresolved one important question likely to be presented in similar cases in the future (and thus that must be addressed by the draftsmen of guidelines for dealing with situations like this): if, in a particular instance, government officials demonstrate that the testimony of an informant is *essential* to the prosecution of an important leader of organized crime and that the interests of a non-custodial parent and members of the informant's household cannot be accommodated without risking human life, may the government go ahead, accept the informant and his family into the program, and subsequently deny the parent access to the children?

■■■ Courts' traditional reluctance to confront questions of this order means that we have very little to go on. We know, of course, that a state's legitimate interests in protecting children's welfare and in promoting the public health, safety, welfare and morals are sufficient to justify minor restrictions on parents' control over the upbringing of their offspring. *Wisconsin v. Yoder,* 406 U.S. 205, 233, 92 S.Ct. 1526, 1542, 32 L.Ed.2d 15 (1972) (dicta); *Prince v. Massachusetts,* 321 U.S. 158, 166–70, 64 S.Ct. 438, 442–444, 88 L.Ed. 645 (1944). And, if it can show that a parent is "neglectful" or otherwise unfit to care for a child, a state may sever the bond between the two. *Stanley v. Illinois,* 405 U.S. 645, 652, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551 (1972) (dicta).[95] But there are few other features on this doctrinal map. Without any markings to assist us in getting our bearings, our answer to the aforementioned question might turn solely upon whether we felt that the suppression of organized crime was sufficiently important to be fairly described as "compelling."

Any inclination we might have to speculate on that issue is dissipated by the paucity of relevant evidence in the record before us and the inconclusiveness of the data available from other sources. Observers and scholars continue to disagree not only over the likelihood that an informant will be "disciplined" by those he implicates[96]

---

**93.** This general mode of analysis is discussed and criticized in Linde, *Due Process of Law Making,* 55 Neb.L.Rev. 197, 207–13 (1976); *The Constitution and the Family, supra* note 62, at 1211 n. 95.

**94.** *See* Parts IV.B. and IV.C. *infra.*

**95.** The guidance we might gain from this rule is limited by the fact that a finding of neglect or unfitness not only strengthens the state's *parens patriae* interest in the child's welfare, but strongly suggests that the bond between the parent and child has already atrophied. The rule thus tells us little regarding what is necessary to warrant termination of a healthy, ongoing relationship.

**96.** *Compare* J. Albini, The American Mafia 267–69 (1971) (If a participant breaks the code of silence and reveals facts that "might be legally devastating to important syndicate participants, he probably will be killed. The latter is almost always the case when an informant gives evidence resulting in the indictment or conviction of an important syndicate functionary. We say almost always because in some cases, social conditions [such as fear of a police crack-down prompted by adverse publicity] may warrant against it.") *with* F. Ianni & E. Reuss-Ianni, A Family Business 146–49 (1972) (study of one Italian-American crime family yielded no evidence of the use of "coercive sanctions" for violations of "rules of conduct" (including the "rule of secrecy"), though "it would be naïve to suggest that such sanctions

(and thus the need for a Witness Protection Program), but also over the nature and scope of the activities conducted by organized crime [97] and the seriousness of the threat that such activities pose to law-abiding citizens and to the integrity of our economic and political systems.[98] Given the range of respectable opinions on these crucial issues, we must decline to say more than that the assessment of the relative strength of the government's interest and the parent's and children's rights will be a difficult task for the body that ultimately must undertake it.

### B.

 Assuming, *arguendo,* that the government's interest in the suppression of organized crime is sufficiently potent to

justify invasion of constitutionally protected familial rights, the government may not rely on an irrebuttable presumption that its interest would be promoted in a given case, without affording the affected parties an opportunity to prove otherwise. *Stanley v. Illinois,* 405 U.S. 645, 657–58, 92 S.Ct. 1208, 1215–16, 31 L.Ed.2d 551 (1972).[99] In part, this principle is an outgrowth of the doctrine of procedural due process.[100] In part, it is a corollary of the doctrine of substantive due process:[101] avoidance of any unnecessary infringement of fundamental rights requires that the government make a *particularized* showing of advantage in every case in which it contemplates depriving someone of constitutionally protected interests.[102]

do not exist") *and* R. Clark, Crime in America 73 (1970) ("discipline" is not as strict as it once was).

**97.** *Compare* President's Comm. on Law Enforcement and Admin. of Justice, The Challenge of Crime in a Free Society 187–96 (1967) (describing a vast and expanding network of illegal operations) *with* R. Clark, *supra* note 96, at 73 ("The wealth and income of organized crime are exaggerated beyond reason.").

**98.** For a spectrum of views, see President's Comm., *supra* note 97, at 187–88 ("The millions of dollars [organized crime] can spend on corrupting public officials may give it power to maim or murder people inside or outside the organization with impunity, to extort money from businessmen, to conduct businesses in such fields as liquor, meat, or drugs without regard to administrative regulations, to avoid payment of income taxes, or to secure public works contracts without competitive bidding. The purpose of organized crime is not competition with visible, legal government but nullification of it. When organized crime places an official in public office, it nullifies the political process. When it bribes a police official, it nullifies law enforcement."); J. Albini, *supra* note 96, at 55–78 (Organized crime serves Americans' apparently ineradicable need for "illicit" goods and services, but does so partly through infiltration and corruption of the political system.); *id.* at 269–83 ("[V]iolence or the threat of it" is used extensively to eliminate competition in illegal activities but seemingly not to enter legitimate businesses; extension and collection "in kind" of illegal, usurious loans is sometimes used to take over, in whole or in part, legitimate businesses.); F. Ianni & E. Reuss-Ianni, *supra* note 96, at 89–106 (study of one crime family revealed extensive and grow-

ing involvement in "legitimate" as well as "illegitimate" businesses and substantial indirect transfers of funds from the latter to the former but little if any of the (once common) use of extortion and other illegal methods to expand "legitimate" operations and drive out competition); D. Smith, The Mafia Mystique 331–35 (1975) (The threatening aspect of organized crime derives largely from our fear that it will undermine our belief in and commitment to ideals such as democracy and "equal justice"; such a perception is misleading insofar as it focuses attention and animus on one of the products, not the cause, of forces and practices that are undermining our values.).

**99.** *See also Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 644–48, 94 S.Ct. 791, 798–800, 39 L.Ed.2d 52 (1974); *In re Linehan,* 280 N.W.2d 29, 32–33 (Minn.1979); *State v. Robert H.,* 118 N.H. 713, 393 A.2d 1387, 1391 (1978); Disanto & Podolski, *The Right to Privacy and Trilateral Balancing—Implications for the Family,* 13 Fam.L.Q. 183, 209–10 (1979).

**100.** *See* Part IV.D. *infra.*

**101.** *See* Part IV.A. *supra.*

**102.** In recent years, the Supreme Court has sharply curtailed the scope of the "irrebuttable presumption" doctrine. *See Weinberger v. Salfi,* 422 U.S. 749, 770–85, 95 S.Ct. 2457, 2469–76, 45 L.Ed.2d 522 (1975). The Court has made clear, however, that the doctrine remains viable when fundamental rights are at stake. *See Turner v. Department of Employment Sec.,* 423 U.S. 44, 46, 96 S.Ct. 249, 250, 46 L.Ed.2d 181 (1975) (per curiam); *Weinberger v. Salfi,* 422 U.S. at 771–72, 95 S.Ct. at 2469–70.

■ In this case, there *may* have been such a particularized determination; the governing Justice Department Order instructs the Assistant Attorney General in charge of the concerned division to admit a witness and his household into the program only upon a finding that (among other things) admission "would be advantageous to the Federal interest." [103] But, putting aside for the moment the high risk of error in such an *ex parte* judgment made by an interested party,[104] there is no indication in the record that the Assistant Attorney General was ever aware that induction of Allen, Catherine and the children would have the effect of terminating the relationship between the children and their natural father. The Constitution requires that there be more than a determination that the "Federal interest" would be marginally advanced by taking action in a particular case; there must be a showing that the governmental interest would be promoted in ways sufficiently substantial to warrant overriding basic human liberties. That requirement has not been met in this case.

### C.

To justify restriction of constitutionally protected activity, the government must do more than show that such curtailment would promote, in a particular case, compelling governmental interests.

> [I]f there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose "less drastic means."

*Dunn v. Blumstein,* 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972) (quoting *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960)). This principle has been repeatedly reaffirmed when constitutionally protected familial

rights have been threatened. *See Carey v. Population Services International,* 431 U.S. at 686, 97 S.Ct. at 2016; *Doe v. Bolton,* 410 U.S. 179, 194–95, 93 S.Ct. 739, 748–49, 35 L.Ed.2d 201 (1973); *Roe v. Wade,* 410 U.S. 113, 155, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973).

In this case, the defendants concede that they were and are capable of arranging secret meetings between William and the children.[105] They acknowledge that such contacts would not jeopardize the safety of the children, Catherine or Allen. And, whatever may be the legal or equitable constraints on their ability, at this juncture, to demand that Catherine permit the children to see their father, it is beyond dispute that they had the authority, at the time they accepted Allen and his family into the program, to insist that Catherine agree to such an arrangement.[106] There is no suggestion in the record that the defendants would have been unable to induce Allen to testify had they demanded that the rights of the·plaintiffs be accommodated in the aforementioned manner. In short, the defendants apparently had ready access to a "less drastic means" for achieving their goals. Their decision not to avail themselves of that option was inconsistent with their duty under the Constitution.

### D.

It is beyond dispute that

> state intervention to terminate the relationship between [a parent] and [a] child must be accomplished by procedures meeting the requisites of the Due Process Clause.

*Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982) (quoting *Lassiter ·v. Department of Social Services,* 452 U.S. 18, 37, 101 S.Ct. 2153, 2165, 68 L.Ed.2d 640 (1981) (Blackmun, J., dissenting)).[107] Conformity with the princi-

---

103. *See* text at note 13 *supra.*

104. That risk is considered in Part IV.D. *infra.*

105. *See* text at note 28 *supra.*

106. *See* text at notes 29–32 *supra.*

107. *See also Lassiter v. Department of Social Servs.,* 452 U.S. at 27–32, 101 S.Ct. at 2159–62; *id.* at 59–60, 101 S.Ct. at 2176 (Stevens, J., dissenting); *Rivera v. Marcus,* 696 F.2d 1016, 1028–29 (2d Cir.1982) (removal of foster chil-

ples of procedural due process, in this context, serves three independent functions. First, by exposing to adversarial testing the government's asserted rationale for its action, it reduces the likelihood of error—*i.e.,* the risk that the government will act on the basis of what, in reality, is an insufficient justification.[108] Second, it permits the adversely affected parties to inform the government of ways in which the government's objectives might be achieved through means less restrictive of their rights. Third, it accords the affected parties some measure of dignity; it enables them to participate in and understand the process whereby their interests are assessed and, if necessary, restricted.[109]

■ It is clear that "the requisites of the Due Process Clause" were not satisfied in the instant case. The defendants have never provided William with any kind of notice or opportunity to be heard. The Constitution certainly requires that much.[110]

How much more the Constitution requires in situations like that before us is far from clear. Set forth below are some of the major considerations that must be taken into account when designing a system for dealing with cases of this sort. Formulation of the details we must leave to a body with greater knowledge than we possess of the ways in which the Witness Protection Program does or might operate.

We begin with the principle that,

> [b]efore a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event."

*Board of Regents v. Roth,* 408 U.S. 564, 570 n. 7, 92 S.Ct. 2701, 2705 n. 7, 33 L.Ed.2d 548 (1972) (quoting *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971)) (emphasis added). Holding the hearing before execution of the decision is particularly important where, as here, the deprivation of the protected interest might be irrevocable or might cause irreparable harm and where the decision will not turn on judgments that can sensibly be made on the basis of written submissions.[111]

At oral argument, the defendants' counsel argued that the need for secrecy and speed in the admission of witnesses might make a pre-entrance hearing of any sort impracticable. In some cases that may well be true, but it appears that in the majority of cases the Attorney General's office now informs the Marshals Service of a decision to admit an informant at least three work-

---

dren from the custody of their half-sister can be accomplished only in accordance with procedural due process).

**108.** For explication of this error-avoidance function, see *Fuentes v. Shevin,* 407 U.S. 67, 80–81, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972).

**109.** *See* Michelman, *Formal and Associational Aims in Procedural Due Process,* XVIII Nomos 126 (1977); L. Tribe, American Constitutional Law 502–03 (1978).

**110.** *See Armstrong v. Manzo,* 380 U.S. 545, 550, 85 S.Ct. 1187, 1190, 14 L.Ed.2d 62 (1965) (a divorced father may not be deprived of his visitation rights (through adoption of the child by the mother's new spouse) without, at a minimum, "notice and opportunity for hearing appropriate to the nature of the case") (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950)).

**111.** The Supreme Court, in *Mathews v. Eldridge,* 424 U.S. 319, 340–45, 96 S.Ct. 893, 905–07, 47 L.Ed.2d 18 (1976), justified postponing an evidentiary hearing until after the termination of social security disability payments largely on the grounds that (i) the decision was easily reversible, (ii) retroactive payment of any erroneously withheld benefits would avoid any irreparable harm, and (iii) the decision in question depended almost entirely on a medical judgment that could be made competently (at least temporarily) on the basis of written submissions by the recipient's doctor. In this situation, by contrast, (i) it is likely to be unfeasible for the government to revoke a decision to admit a witness and his family into the program, (ii) without advance planning it may be difficult or impossible after the fact to accommodate the rights of the non-relocated parent (or periodic secret meetings may be an inadequate substitute for the relationship he formerly enjoyed with his children), and (iii) written submissions could not adequately inform a decisionmaker.

days prior to the scheduled pick-up.[112] It seems to us not inconceivable that, sometime during those three days, a secret meeting might be held to hear and evaluate the government's assertions of need and the objections and claims of the non-relocated parent.

▓▓▓▓ In those instances in which holding such a hearing would truly be impossible, the requirements of the Due Process Clause would be merely suspended, not eliminated; [113] as soon as practicable after the admission of the informant, a hearing would have to be held, at least to work out some accommodation of the rights of the children and the parent left behind.[114]

Envisioning what a pre-admission (or post-admission) hearing might look like is no easy task. The affected parties would be entitled to no more (and no less) than a hearing "appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). The situation before us is so idiosyncratic that it is difficult to predict the kind of "process" that both would be workable and would fulfill the three functions described above. We are unable to do more than offer the following suggestions:

(1) The irrevocability of decisions to admit witnesses and their households, combined with the virtual impossibility of obtaining meaningful judicial review of such judgments, strongly suggests that those determinations should be made in accordance with a standard set of basic procedures, not processes developed and modified on a case-by-case basis. *Compare Santosky v. Kramer,* 455 U.S. at 757 & n. 9, 102 S.Ct. at 1396 n. 9 (procedural "rules of general application" necessary when appellate review would be insufficient to ensure "fundamental fairness"), *with Lassiter v. Department of Social Services,* 452 U.S. at 31–32, 101 S.Ct. at 2162 (procedures determined on a case-by-case basis suffice when appellate review would be an adequate check).

(2) This is not to say that those procedures should be highly formal; quite the contrary. The need for confidentiality and some measure of speed, combined with the value of encouraging the parties to speak freely with one another in working out a mutually satisfactory solution to their common problem, argues in favor of an informal setting. Some kind of neutral arbiter might have to be present, but the emphasis should be on negotiation and accommodation, not confrontation.

(3) In deciding more specific questions relating to the form of the proceeding— *e.g.,* whether the parties should have a right to be represented by counsel, should be able to present or cross-examine witnesses, etc. —reference should be made to the three factors set forth in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), for the selection of a procedure that optimally balances the reduction of the risk of error and the burdensomeness of additional safeguards.[115] Reliance on those con-

---

**112.** *See* Order OBD 2110.2, *supra* note 11, at ¶¶ 7b–7c, *reprinted in* 1978 *Hearings* at 136; 1980 *Hearings* at 243–44 (testimony of Howard Safir).

**113.** *See Boddie v. Connecticut,* 401 U.S. at 379, 91 S.Ct. at 786; *Duchesne v. Sugarman,* 566 F.2d 817, 826, 828 (2d Cir.1977).

**114.** In such circumstances, it would also be imperative that the witness and the adult members of his household be informed, *prior* to their admission, that such a hearing would be held soon after their induction. Moreover, they would be admitted only on the condition that they agree to abide by whatever arrangement is worked out at that session for accommodating the interests of the children's other parent. An additional provision in the standard Memorandum of Understanding might suffice for these purposes.

**115.** The Supreme Court there held:

[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and fi-

**610**

siderations should be tempered, however, by sensitivity to (a) the need to foster negotiation and compromise and (b) the importance of involving the non-relocated parent in the decisionmaking process.[116]

CONCLUSION

For the foregoing reasons, the District Court's decision that the plaintiffs failed to state a claim for which relief could be granted is reversed. The case is remanded for further proceedings consistent with this opinion.

Because of the posture in which the suit has appeared before us, we express no opinion on the truth of the allegations in the complaint. We also decline to reach a host of other issues that further prosecution of the case may raise: the merits of the defendants' various jurisdictional defenses; whether some or all of the defendants are immune from liability; and the form or measure of relief that might be appropriate. These are all matters that might be addressed on remand.

As to the propriety and utility of pressing onward in litigation, we venture our opinion that ultimate resolution of this controversy by a court may not be the ideal solution for any of the parties. As the disputants conceded at the outset, this case involves a conflict between several powerful, legitimate interests. Guided by the foregoing clarification of their respective claims, the parties are likely to be better able than a judge to work out an arrangement for reconciling—or at least compromising between—their various needs and desires.

With regard to the general problem presented by this case, we reiterate our plea that either Congress or the administrators of the Witness Protection Program develop a set of guidelines that would facilitate the

detection and accommodation of interests like those of the plaintiffs.

*Reversed and remanded.*

nally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
*Id.* at 335, 96 S.Ct. at 903. *See also Santosky v. Kramer,* 455 U.S. at 754, 102 S.Ct. at 1394;

*Lassiter v. Department of Social Servs.,* 452 U.S. at 27–31, 101 S.Ct. at 2159–61; *Smith v. Organization of Foster Families,* 431 U.S. 816, 848–49, 97 S.Ct. 2094, 2112, 53 L.Ed.2d 14 (1977).

**116.** *See* text at note 109 *supra.*