

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00087-CV

_____


IN THE INTEREST OF J.M.A.E.W., A CHILD


On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2013-2394-DR


Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss
Concurring Opinion by Justice Burgess

MEMORANDUM OPINION

After having his parental rights to his son, Josh, Jr.,[1] terminated, Josh appeals, not challenging the sufficiency of the evidence to establish termination,[2] but claiming only that his trial counsel was ineffective in failing to investigate Josh's claimed intellectual disability, in failing to plead and prove an intellectual-disability defense under the Americans with Disabilities Act[3] (ADA), and in failing to plead and prove a defense of diminished capacity/intellectual disability (referred to hereafter as, simply, "intellectual disability"). Because we find that Josh has failed to show ineffective assistance of counsel, we affirm the judgment of the trial court.

While Josh does not challenge the sufficiency of the evidence, we review the factual background for the light it may shed on Josh's arguments on appeal. On November 30, 2013, Ashley Moore, an investigator for Child Protective Services,[4] received a report of possible negligent supervision and physical abuse of Josh, Jr., by Josh. The report alleged physical abuse by Josh and that Josh, Jr., was dirty, smelled bad, and was exhibiting inappropriate sexual behavior. When Moore investigated, she found no marks or bruises on Josh, Jr. However, although Josh claimed he had bathed the child the day before, Josh, Jr., had a very strong body odor and was very dirty, having dirt caked on his feet and hands and under his fingernails. Even

---

[1]We will refer to the appellant as "Josh," to the child as "Josh, Jr.," to the child's mother as "Laura," to Josh, Jr.'s, sister as "Amy," and to Josh's third cousin and his wife as "Carl" and "Patty." *See* TEX. R. APP. P. 9.8.

[2]After a bench trial, Josh's parental rights were terminated under Section 161.001(1)(D), (E), and (O) of the Texas Family Code and on a finding that termination was in the best interest of Josh, Jr. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E) & (O) (West 2014).

[3]*See* 42 U.S.C.A. §§ 12101–213 (West, Westlaw current through Dec. 19, 2014).

[4]Child Protective Services is a division of the Texas Department of Family and Protective Services. Both will hereinafter be referred to as "the Department."

though he was almost three and one-half years old, Josh, Jr., was nonverbal and would communicate by screaming, making noises, and pointing his fingers. Although Josh claimed that this was because Josh, Jr., was deaf, it was learned later that Josh, Jr.'s, hearing was normal. Josh, Jr., was very aggressive and appeared to have no boundaries. Josh exhibited no control over him. Even though it was pretty dark outside, Josh, Jr., would continuously run around parked cars, behind their mobile home, and out into the highway; yet, Josh seemed to pay no attention. Rather, a police officer who accompanied Moore to Josh's residence redirected Josh, Jr., away from the highway. In addition, Josh, Jr., still wore diapers and had not been potty trained. Josh was unemployed and had no money. Father and son had been living place to place. Josh had only one change of clothes for Josh, Jr., and two pairs of pants for himself. He told Moore that he had cared for Josh, Jr., since the boy was six months old, when Josh, Jr.'s, mother, Laura, had left them and moved to West Virginia. He wanted Josh, Jr., to go into foster care because he was not able to provide stability for him at that time.

Josh, Jr., was removed from the home and placed in foster care. He was initially placed in a therapeutic foster home experienced in dealing with children with special needs. About three months later, the boy was placed in the home of Josh's third cousin, Carl, and Carl's wife, Patty, who had previously adopted Josh's daughter, Amy, after she had been removed from Josh's and Laura's care. Maribel Graham, a caseworker for the Department, testified that, after going into foster care, Josh, Jr., began receiving speech therapy and occupational therapy to address his delayed development. After being placed with Carl and Patty, Josh, Jr., learned to listen and follow directions, began talking and learning his letters, learned to use utensils, began

3

potty training, and began appropriately giving and receiving affection. Graham and Patty stated that, in the future, he will continue to need speech and occupational therapy to help develop his motor and cognitive skills before he will be ready for school.

Though Josh, Jr., was making great strides while in foster care, Josh was neither advancing in his parenting skills nor demonstrating a strong interest in doing so. At the first hearing after Josh, Jr., was removed from his care, Josh acknowledged that his attorney had explained the temporary orders to him and that he understood what was required of him. In response to questioning by the trial court, Josh acknowledged understanding that he needed to take parenting classes, obtain a psychological evaluation, and begin counseling sessions. He stated that he understood both the importance of doing these things and that his failure to do them or to provide his child with a safe home environment could result in the termination of his parental rights. Graham testified that she met with Josh after that hearing, that she explained to him what he needed to do to complete his service plan, and that she believed he understood the plan and his obligations under it. At a hearing six weeks after removal, Graham affirmed that a psychological evaluation of Josh had been scheduled. At that same hearing, in response to questions from the trial court, Josh acknowledged that he understood the specifics of the plan, including taking parenting classes and providing a safe home for his child for at least six months. In the next four months, Josh began attending visitations with Josh, Jr., and completed parenting classes at the Department. In his initial four-hour visit with his son at a McDonalds, Josh had very little interaction with him. Graham testified that he did not talk to his son and would only tell him "no" or make noises like "eh" to him. She said he seemed more interested in playing on

4

his cell phone or listening to music. The only interaction would be when Josh showed his son a short video or would chase him when Josh, Jr., left the playground to go into the eating area. Although she would encourage him to talk and play with his son, Graham testified that Josh would do so for only five or ten minutes before returning his attention to his cell phone. Josh continued to have two-hour visitations with his son every other week, but, according to Graham, he still had very little interaction with his son, even after completing parenting classes and in spite of her efforts to guide him regarding appropriate parenting. The lack of interaction at the visitations continued through his last visitation in September. Josh also missed his original appointment for his psychological evaluation, as well as a second appointment. At a hearing six months after the case began, the trial court warned Josh that, if he did not obtain a psychological evaluation by the next hearing, he was in danger of losing visitation rights with his son. Josh finally had a psychological evaluation in August 2014 that showed him to be in the average intelligence range and that indicated that counseling was important for him. However, although the trial court had ordered him to begin counseling at the initial hearing and the Department had made arrangements for him to obtain counseling throughout the case, Josh never obtained counseling. Further, Josh lived at a homeless shelter from shortly after the case began through trial. Segunda Strange, a conservatorship supervisor for the Department, testified that Josh had not demonstrated that he is able to parent his son successfully, such as meeting the basic needs of food, shelter, and clothing. She said Josh had neither shown that he could obtain housing or maintain a home, nor made any other changes that indicated he would do anything differently in the future than he had in the past. Josh had not expressed any plans for Josh, Jr., and she did not

5

think his son would be safe with him or that he would be able to meet his son's educational and developmental needs. She agreed with Graham that Josh, Jr.'s, developmental delays and inappropriate behavior had been caused by Josh's failure to interact with, set appropriate examples for, and teach him.

Josh explained that his failure to complete his service plan resulted from his holding down two jobs. However, he had two jobs for only about three months. He testified that, if he were to get his son back, he would reunite with his wife, Laura, and they would live with her family. He explained that, when they were living with her, she took care of Josh, Jr., and made sure he went to the doctor and dentist. However, he also acknowledged that he and Laura had been separated for over two years and admitted that she had not attended any of his visitations with Josh, Jr. Further, Graham testified that, notwithstanding Josh's claims to the contrary, Laura stated that she would not be getting back together with him. Josh said he had learned how to become a better parent and that he would be able to give him the interaction and attention he needs. He also said that he had a plan to provide food, clothing, and shelter, but that the plan was dependent on reuniting with Laura.

After hearing the recommendation of Josh, Jr.'s, attorney ad litem, the trial court found that there was clear and convincing evidence to terminate Josh's parental rights under Section 161.001(1) (D), (E), and (O) of the Texas Family Code and that termination was in the best interest of the child and entered its order of termination October 12, 2014. Josh filed a motion

6

for new trial and an amended motion for new trial.[5]  A hearing on the amended motion for new trial was held December 2, 2014.

Although the amended motion for new trial was denied, the trial court allowed Josh to make an offer of proof.  The only witness testifying at the hearing was Josh's mother.  She testified that when Josh was born, he suffered from a deprivation of oxygen that resulted in a brain injury.  She maintained that he has suffered from an intellectual disability all his life.  According to her, Josh was always behind the other kids developmentally and was several levels behind in reading and math by the time he was in the sixth or seventh grade.  She said he graduated from Kilgore High School, but in special education.  She testified that, from elementary through high school, Josh needed help in remembering things and had to be reminded to do things.  His high school transcript was introduced into evidence and it showed that he graduated 181st out of 221 students and that he was exempt from Texas tests.  When Josh was caring for his children and could not figure out what might be wrong, she would help remind him what it might be.  She said that nobody from the Department had contacted her and that, if they had, she would have told them about his disability.  She believes they should have taken this into account in formulating his service plan because things do not register completely before he will go to something else.  She also testified that Josh and his wife were living together again and that they would be a suitable placement for Josh, Jr.  Josh also introduced the kinship caregiver home assessment into evidence at the hearing.

---

[5]Neither the motion for new trial nor the amended motion for new trial are part of the appellate record.

7

In parental-rights termination cases in Texas, brought by the Department an indigent person has a statutory right to counsel. TEX. FAM. CODE. ANN. § 107.013(a) (West 2014); *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). This statutory right to counsel also embodies the right to effective counsel. *M.S.*, 115 S.W.3d at 544. The standard used for parental-rights termination cases is the same as that used in criminal cases and is set forth in *Strickland*. *Id.*; *see Strickland v. Washington*, 466 U.S. 668 (1984). The right to effective assistance of counsel does not guarantee, however, "errorless or perfect counsel whose competency of representation is to be judged by hindsight." *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006).

To prevail on his ineffective assistance claim, Josh must prove by a preponderance of the evidence that (1) his counsel's performance was deficient, that is, that it fell below an objective standard of reasonableness; and (2) it is reasonably probable that, except for his counsel's unprofessional errors, the outcome of the proceeding would have been different. *See Strickland*, 466 U.S. at 687–88, 694. To support a finding that Josh's trial counsel was ineffective, the trial record must affirmatively demonstrate his deficiency. *Bermea v. Tex. Dep't of Family & Protective Servs.*, 265 S.W.3d 34, 43 (Tex. App.—Houston [1st Dist.] 2008), *pet. denied*, 264 S.W.3d 742 (Tex. 2008) (per curiam). In reviewing trial counsel's performance, we take into account the circumstances surrounding the case and focus primarily on whether the manner of his performance was reasonably effective. *In re H.R.M.*, 209 S.W.3d 105, 111 (Tex. 2006); *M.S.*, 115 S.W.3d at 545. We give great deference to trial counsel's performance and indulge a strong presumption that his conduct falls within the wide range of reasonably professional assistance. *H.R.M.*, 209 S.W.3d at 111; *M.S.*, 115 S.W.3d at 545. This includes the possibility

8

that his actions were strategic. *H.R.M.*, 209 S.W.3d at 111; *M.S.*, 115 S.W.3d at 545. If the record is silent regarding the reasons for his actions, we do not engage in speculation to find trial counsel rendered ineffective assistance of counsel. *In re L.C.W.*, 411 S.W.3d 116, 127 (Tex. App.—El Paso 2013, no pet.). We only find ineffective assistance if the conduct is "so outrageous that no competent attorney would have engaged in it." *H.R.M.*, 209 S.W.3d at 111.

In determining whether counsel's alleged deficiencies harmed Josh, we presume that the fact-finder acted in accordance with the law. *See Strickland*, 466 U.S. at 694. In assessing harm, we consider the totality of the circumstances and evidence presented to determine whether "'there is a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding would have been different.'" *M.S.*, 115 S.W.3d at 550 (quoting *Garcia*, 57 S.W.3d at 440). Failure to satisfy either prong of the *Strickland* test is fatal. *Ex parte Martinez*, 195 S.W.3d 713, 730 n.14 (Tex. Crim. App. 2006); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Thus, if an appellant fails to show that it is reasonably probable that the outcome would have been different with the wished-for performance by counsel, we need not determine whether trial counsel's actual performance was deficient. *Strickland*, 466 U.S. at 697; *Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011).

Josh asserts that his trial counsel was deficient in failing to investigate his claimed intellectual disability, failing to plead and prove a defense under the ADA, and failing to plead and prove a defense of intellectual disability. Josh acknowledges that all of these grounds have the same nexus and has briefed them as one point.

9

While we do not conclude that Josh has demonstrated the existence of a viable defense to the termination of parental rights either under the ADA or based on intellectual disability[6] (or that he suffers from an intellectual disability that would qualify him to assert such a defense), even assuming such a defense is viable, Josh has not shown harm, i.e., that, it is reasonably probable that the outcome of the trial would have been different.

Josh seeks to convince us that the outcome would have been different if the Department had tailored a program for him that accommodated his alleged disability. He claims that such a program would entail

> more frequent interactions and more frequent reminders and actual assistance to him by [the Department] in setting up appointments for counseling and psychological testing and finding suitable housing, and providing hands-on guidance in how to interact constructively with his son, that is, showing by example, not just sitting idly by and telling him, but getting up and gently but persuasively showing him: this is what a little child wants you to do—then demonstrating it, if necessary, many times.

---

[6]Josh does not direct us to any case that has recognized a defense under the ADA in parental-rights termination cases. This Court has previously noted that "there is no authority that such a defense could be properly raised in a proceeding of this nature" and declined to recognize such a defense. *In re A.M.M.*, No. 06-05-00039-CV, 2006 WL 42229, at *6 (Tex. App.—Texarkana Jan. 10, 2006, no pet.) (mem. op.). The Beaumont Court of Appeals, agreeing with authorities from other jurisdictions, has also declined to recognize an ADA defense. *In re S.G.S.*, 130 S.W.3d 223, 230 (Tex. App.—Beaumont 2004, no pet.). We have found no other Texas case in which the issue was directly decided, each finding the issue had been waived on appeal. *See In re M.N.M.*, No. 05-14-00723-CV, 2014 WL 6737003, at *12 (Tex. App.—Dallas Dec. 1, 2014, no pet. h.) (mem. op.); *In re P.M.*, No. 02-14-00205-CV, 2014 WL 6494003, at *34 (Tex. App.—Fort Worth Nov. 20, 2014, no pet.) (mem. op.); *In re C.L.*, No. 07-14-00180-CV, 2014 WL 5037982, at *3–4 (Tex. App.—Amarillo Oct. 7, 2014, no pet.) (mem. op.); *In re J.I.*, No. 02-04-299-CV, 2005 WL 1047891, at *14 (Tex. App.—Fort Worth May 5, 2005, no pet.) (mem. op.); *In re B.L.M.*, 114 S.W.3d 641, 649 (Tex. App.—Fort Worth 2003, no pet.); *In re C.M.*, 996 S.W.2d 269, 270 (Tex. App.—Houston [1st Dist.] 1999, no pet.). Josh asserts a theory of defense based on intellectual disability by extrapolating from United States Supreme Court cases involving persons with intellectual disabilities who are sentenced to death. *See Hall v. Florida*, 134 S.Ct. 1986 (2014); *Atkins v. Virginia*, 536 U.S. 304 (2002). He does not cite, nor have we found, any authority that has applied the protections recognized in *Atkins* and *Hall* to parental-rights termination cases. We note also that in both those cases there was substantial evidence of the defendant's intellectual disability. *Hall*, 134 S.Ct. at 1991; *Atkins*, 536 U. S. at 308–09.

10

After alleging that the similarity of his and Laura's service plans constitutes evidence of the Department's failure to accommodate his disability, Josh claims that the harm in failing to investigate and assert a defense based on his alleged intellectual disability is self-evident:

> One can easily imagine that if [the Department] had been forced to answer how it had effectively discriminated against [Josh], that its case for abuse and neglect would have been severely undercut, to the extent that the evidence would not have been either clear or convincing. [Josh's] alternative narrative of intellectual disability/diminished capacity would have been a disrupting wedge in [the Department's] otherwise smooth case for termination. Moreover, had the ADA defense or the mitigating evidence of diminished capacity/intellectual disability, -- either way one may want to address it --, or both, been presented, then [the Department] would have been hard put to show how they had taken any positive steps to assist [Josh] in completing the tasks set before him.

However, it is not within our province to "imagine" what might have happened; rather, we are to examine the totality of the circumstances and evidence to determine whether there is a reasonable probability that the outcome would have been different. Although Josh posits what accommodations he believes the Department should have made, he does not point to anything showing (1) that the Department was required to make these accommodations to address his alleged disability or (2) that, if the accommodations had been made, Josh would have been able to complete his service plan and satisfactorily demonstrate to the trial court that he would be capable of adequately parenting Josh, Jr. Further, the record reflects that the Department did most of the things Josh now claims he needed. The evidence shows that the Department made numerous appointments for Josh for both psychological testing and counseling, but that Josh failed to keep them. Since Josh had no transportation, the Department made arrangements for him to obtain counseling with two different counselors who were willing to come to him, but still

11

he would not obtain the counseling. In addition to providing him parenting classes, the Department caseworker attempted to guide him through proper parental interaction with Josh, Jr., at each of his visitations, to no avail. Josh also testified that he had other suitable housing he could have pursued had he wanted, without the help of the Department. Finally, although Josh had extensive interactions with both the Department and the trial court during the course of this proceeding, he never indicated to either that he was in need of any accommodation because of any intellectual disability.

Based on this record, Josh has failed to demonstrate that it is reasonably probable that the outcome of the trial would have been different had trial counsel investigated and pled a defense to the termination of Josh's parental rights either under the ADA or based on intellectual disability. Since we conclude that the record does not support the conclusion that Josh met the second prong of the *Strickland* test, we need not address the first prong. *See Martinez*, 330 S.W.3d at 904.

We affirm the judgment of the trial court.


Josh R. Morriss III
Chief Justice

CONCURRING OPINION

I agree with the Court's thoughtful analysis and ultimate conclusions that Appellant failed to show that his counsel was ineffective in this case for failing to investigate, plead, and prove a diminished capacity defense or a defense under the Americans with Disabilities Act (ADA). I write separately to explain why I believe diminished capacity is not a defense to a parental-rights termination case of this type.[7]

Appellant bases his diminished capacity argument on two United States Supreme Court opinions addressing the death penalty. In *Atkins v Virginia*, 536 U.S. 304, 321 (2002), the Supreme Court held that the Eighth Amendment prohibits states from executing intellectually disabled individuals. In *Hall v. Florida*, __ U.S. __, 134 S.Ct. 1986 (2014), the Supreme Court struck down as unconstitutional a Florida statute that required criminal defendants contesting their eligibility for the death penalty based on intellectual disability to first establish, as a threshold matter, an IQ test score of seventy or below before presenting additional evidence of intellectual disability. *Hall*, 134 S.Ct. at 2001. In both cases, the Supreme Court focused exclusively on the defendant's Eighth Amendment interests.[8] Essentially, *Hall* and *Atkins*

---

[7]This concurrence does not address the applicability of the ADA to Texas parental-rights termination cases. Likewise, it does not address the issue of whether a parent lacks capacity to voluntarily relinquish his or her parental rights.

[8]For instance, in *Hall*, the Supreme Court reasoned,

> No legitimate penological purpose is served by executing a person with intellectual disability. [*Atkins*, 536 U.S.] at 317, 320, 122 S.Ct. 2242. To do so contravenes the Eighth Amendment, for to impose the harshest of punishments on an intellectually disabled person violates his or her inherent dignity as a human being. "[P]unishment is justified under one or more of three principal rationales: rehabilitation, deterrence, and retribution." *Kennedy v. Louisiana*, 554 U.S. 407, 420, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008). Rehabilitation, it is evident, is not an applicable rationale for the death penalty. *See Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 49 L.Ed.2d 859

13

created what amounts to a per se mitigating factor defense to the death penalty where a defendant

is shown to be intellectually disabled:

> We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our "evolving standards of decency," we therefore conclude that such punishment is excessive and that the Constitution "places a substantive restriction on the State's power to take the life" of a mentally retarded offender.

*Atkins*, 536 U.S. at 321.

It is true, as Appellant argues, that there are similarities between death penalty cases and

parental-rights termination cases. Both impact fundamental liberty interests.[9] Many people

would characterize the termination of parental rights as a close second to the death penalty on a

list of the harshest judgments a court can impose.[10] Moreover, the two judgments are similar in

their finality: "a termination decree is complete, final, irrevocable, and divests for all time that

---

(1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). As for deterrence, those with intellectual disability are, by reason of their condition, likely unable to make the calculated judgments that are the premise for the deterrence rationale. They have a "diminished ability" to "process information, to learn from experience, to engage in logical reasoning, or to control impulses . . . [which] make[s] it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information." *Atkins,* 536 U.S. at 320, 122 S.Ct. 2242. Retributive values are also ill-served by executing those with intellectual disability. The diminished capacity of the intellectually disabled lessens moral culpability and hence the retributive value of the punishment. *See id.* at 319, 122 S.Ct. 2242 ("If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution[.]").

*Hall*, 134 S.Ct. at 1992–93.

[9]*See Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court.").

[10]*See Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 40 (1981) (Brennan, J., dissenting) ("Surely there can be few losses more grievous than the abrogation of parental rights.").

14

natural right as well as all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit." *Jordan v. Dossey*, 325 S.W.3d 700, 712 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). Similarly, "[t]here is no question that death as a punishment is unique in its severity and irrevocability." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976). Likewise, both cases are subjected to heightened scrutiny and both afford the litigants unique protections.[11]

On the other hand, unlike a death penalty case, a decision in a parental-rights termination case impacts not only the fundamental liberty interests of the party against whom the termination action is directed, it also impacts the fundamental liberty interests of the party on whose behalf the State's action is initiated. In the words of Justice Stevens,

> Cases like this do not present a bipolar struggle between the parents and the State over who has final authority to determine what is in a child's best interests. There is at a minimum a third individual, whose interests are implicated in every case to which the statute applies—the child.
>
>   . . . .
>
> While this Court has not yet had occasion to elucidate the nature of a child's liberty interests in preserving established familial or family-like bonds, [*Michael H. v. Gerald D.*, 491 U.S. 110, 130 (1989)] (reserving the question), it seems to me extremely likely that, to the extent parents and families have fundamental liberty interests in preserving such intimate relationships, so, too, do children have these interests, and so, too, must their interests be balanced in the equation. At a minimum, our prior cases recognizing that children are, generally speaking, constitutionally protected actors require that this Court reject any suggestion that when it comes to parental rights, children are so much chattel. *See ante*, at 2059–

---

[11]*Compare California v. Ramos*, 463 U.S. 992, 998–99 (1983) ("[T]he qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination."), *with Santosky v. Kramer*, 455 U.S. 745, 761 (1982) ("But for the natural parents, a finding of permanent neglect can cut off forever their rights in their child. Given this disparity of consequence, we have no difficulty finding that the balance of private interests strongly favors heightened procedural protections.").

2060 (opinion of O'CONNOR, J.) (describing States' recognition of "an independent third-party interest in a child"). The constitutional protection against arbitrary state interference with parental rights should not be extended to prevent the States from protecting children against the arbitrary exercise of parental authority that is not in fact motivated by an interest in the welfare of the child. This is not, of course, to suggest that a child's liberty interest in maintaining contact with a particular individual is to be treated invariably as on a par with that child's parents' contrary interests. Because our substantive due process case law includes a strong presumption that a parent will act in the best interest of her child, it would be necessary, were the state appellate courts actually to confront a challenge to the statute as applied, to consider whether the trial court's assessment of the "best interest of the child" incorporated that presumption.

*Troxel v. Granville*, 530 U.S. 57, 86, 89–90 (2000) (Stevens, J., dissenting). The United States Supreme Court similarly observed in *Santosky* that "until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." *Santosky*, 455 U.S. at 760. Likewise, the Supreme Court noted in *Stanley v. Illinois*, 405 U.S. 645, 652 (1972), "We observe that the State registers no gain towards its declared goals when it separates children from the custody of fit parents." Accordingly, in a parental-rights termination case, the State's action impacts the fundamental liberty interests of both parent and child; just as an unfit parent should be removed from the "care, custody, and control" of a child, a child should remain secure in the "care, custody, and control" of a fit parent.[12]

Moreover, the State's goals in bringing the two actions are different. Unlike a death penalty case, in a parental-rights termination case, "the State is not pursuing a retributive or punitive aim, but a 'purely remedial function: the protection of minors.'" *In re A.V.*, 113

---

[12]State action is involved regardless of whether the action is brought by the State or by a private party. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 117, n.8 (1996) (In parental-rights termination cases, "the challenged state action remains the same" whether initiated by the State or private party because the respondent in such cases resists "an official decree extinguishing, as no power other than the State can, [his or] her parent-child relationships.").

16

S.W.3d 355, 361 (Tex. 2003); *see also Lassiter*, 452 U.S. at 34 (Burger, C.J., concurring).

Because the goal of a parental-rights termination case is remedial, rather than being a defense to

termination, a parent's intellectual disability may actually be a factor which renders him or her

"'neglectful' or otherwise unfit to care for [the] child."[13] *Franz*, 707 F.2d at 605.

> A parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *see also In re C.M.B.*, 204 S.W.3d 886, 895 (Tex. App.—Dallas 2006, pet. denied). A parent's mental instability and attempt to commit suicide may contribute to a finding that the parent engaged in a course of conduct that endangered a child's physical or emotional well-being. *In re J.T.G.*, 121 S.W.3d at 126; *see In re A.M.C.*, 2 S.W.3d 707, 716 (Tex. App.—Waco 1999, no pet.) (upholding jury's determination of endangerment where evidence showed mother's suicidal thoughts, suicide attempts, and neglect); *see also In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ) (mental conditions and suicide attempts of parent were factors in considering whether parent engaged in conduct that endangered emotional well-being of child).

*Jordan*, 325 S.W.3d at 723–24.[14] Intellectual disability certainly cannot be deemed irrelevant to

a termination decision. *See In re S.G.S.*, 130 S.W.3d 223, 240 (Tex. App.—Beaumont 2004, no

pet.), and cases cited therein:

---

[13]A parent's fundamental liberty interest in the "custody, care and nurture" of his or her children is not unlimited; in fact, "the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare. . . ." *Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944). Consequently, "if it can [be] show[n] that a parent is "neglectful" or otherwise unfit to care for a child, a state may sever the bond between the two." *Franz v. United States*, 707 F.2d 582, 605 (D.C. Cir.) supplemented, 712 F.2d 1428 (D.C. Cir. 1983) (citing *Stanley*, 405 U.S. at 652).

[14]In fact, it is conceivable that a parent's attempt to prove diminished capacity as a defense to termination may inadvertently prove facts leading a court to find that he or she is "'neglectful' or otherwise unfit to care for [the] child." *Franz*, 707 F.2d at 605. Moreover, it is possible that Appellant's trial counsel took this risk into consideration and made the strategic decision not to raise diminished capacity as a defense. Consequently, the Court cannot find that Appellant's trial counsel's conduct in failing to raise such a defense was "'so outrageous that no competent defense attorney would have engaged in it.'" *In re H.R.M.*, 209 S.W.3d 105, 111 (Tex. 2006) (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

> Neither case stands for the proposition that the [*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)] factors are to be weighed in such a manner that termination cannot be justified in a case where the parents' failure to provide a desirable degree of care and support of the children is due solely to lack of intelligence, training, or misfortune.

Nevertheless, intellectual disability certainly cannot be considered a disqualifying factor for parenthood, either.

> Mental illness or incompetence of a parent alone are not grounds for terminating the parent-child relationship; however, if a parent's mental state causes her to engage in conduct that endangers the physical or emotional well-being of a child, that conduct can support a termination ruling under subsection E.

*In re T.G.R.-M.*, 404 S.W.3d 7, 14 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

Consequently, in a parental-rights termination case, the court must balance the parent's fundamental liberty interests against the child's best interests and determine whether the "strong presumption that a parent will act in the best interest of her child" has been rebutted, *Troxel*, 530 U.S. at 89–90 (Stevens, J., dissenting), even where the parent's intellectual disability gives rise to the allegation that he or she is "'neglectful' or otherwise unfit to care for a child," *Franz*, 707 F.2d at 605. In doing so, the court must consider the impact of its ruling on the child's fundamental "liberty interests in preserving established familial or family-like bonds." *Id.* at 88. The parent's intellectual disability may be a factor to consider in balancing those interests, but that status alone cannot serve as the basis for termination. Rather, the State must produce other evidence establishing a danger to the child's well-being. Where the appropriate balance lies will ultimately depend upon the facts in each individual case, but in no parental-rights termination case can a bright line rule be drawn as it was in *Atkins* and *Hall*.

For these reasons, Appellant's attempt to extrapolate a diminished-capacity defense to a parental-rights termination case fails, and his counsel's failure to plead and prove that defense does not constitute ineffective assistance of counsel.

Ralph K. Burgess
Justice

Date Submitted:     February 23, 2015
Date Decided:       March 13, 2015

19